## GATES et al., v. SEIBERT et al., Appellants.

### In Banc, June 19, 1900.

1. **Perpetuities:** MEANING OF RULE AGAINST. The rule against perpetuities does not require that the remainder over must vest *in possession* within the period prescribed by said rule, but that it must vest *in interest* within that period. It is not the right of present enjoyment which must become vested within the time limited by the rule, but a present fixed right of future enjoyment.

Gates v. Seibert.

2. ——: RULE NOT APPLICABLE TO VESTED REMAINDERS. The rule against perpetuities was designed to prevent unreasonable restrictions upon the alienation of lands. There being no restriction upon the alienation of vested remainders, under our laws, such remainders are not within the rule.

3. ——: VESTING OF CONTINGENT REMAINDERS: DEVISE CONSTRUED. A testator devised land "to my son J. S. G. (and his wife if he should marry), and after their decease to his children." *Held,* that the limitation over to the children of J. S. G., is not within the rule against perpetuities, for the reason that if J. S. G. should marry and have a child, the estate in remainder must certainly vest in such child within ten months after the death of J. S. G., even though the mother of the child might survive the father more than twenty-one years.

4. ——: VESTING AND OPENING OF REMAINDERS: CLASSES. *Held,* further, that the remainder when so vested in the first child born of the marriage of J. S. G., was held by such child as representative of all the children of said marriage; and that as other children of the class were born of a second marriage, said remainder opened, as they were born, for their admission.

5. ——: DEATH OF MEMBER OF CLASS. Upon the death of a member of said class of remaindermen, intestate, his share descended to his heirs at law, subject to diminution from increase of the class.

6. Devise to Children: RIGHT OF LEGITIMATED CHILD TO SHARE. Section 2917, R. S. 1899, though now found in the chapter relating to descents and distributions, applies equally to rights dependent upon wills. By virtue of that section, a bastard child, whose parents intermarry and whose father recognizes such child as his own, is entitled to share with legitimate offspring born of his second marriage, under a devise to his "children."

Appeal from St. Louis County Circuit Court.—*Hon. Rudolph Hirzel,* Judge.

AFFIRMED.

*Wm. B. Thompson, Noble & Shields* and *D. C. Taylor* for appellants.

(1) The fifth clause of the will of John Gates, deceased (being the clause under which plaintiffs claim), vio-

lates the rule against perpetuities, and the limitation over is void, and the estate vested in Jacob S. Gates in fee, or, if the whole clause is void, the land descended to all of the heirs of John Gates; none of the title vested in the plaintiffs in either event, for that to which Jacob S. Gates was entitled, either whole or part, and that portion thereof that he acquired by deed from the other heirs, he conveyed by the deed of trust under which defendants claim.   Gray's Rule Against Perpetuities, chap. 6, p. 144 (1886), secs. 201 and 214; 1 Washburn on Real Property (5 Ed.), p. 115.   This rule is in full force in Missouri, and is declared to arise from the policy of the law being against clogging the free alienation of estates.   Lockridge v. Mace, 109 Mo. 162; Chism's Admr. v. Williams, 29 Mo. 288.   (2)   If said "fifth" clause of said will is valid, then under the facts, as proven, the finding should be for defendants.   The marriage of Jacob S. Gates to Lizzie Cool, the birth of a child, the death of its mother, followed by the death of the child, operated to and did vest the title in fee in Jacob S. Gates.   4 Kent, p. 202 (5 Ed.), and note cited at p. 205; Annaball v. Patch, 3 Pick. Rep. 360; Fearne on Remainders, 394-396; Doe v. Perryn, 3d Term'l Rep. 464; 2 Washburn on Real Property (4 Ed.), p. 228; Kingsley v. Brownard et al., 19 Fla. 722; Waddell v. Waddell, 99 Mo. 338; Jones v. Waters, 17 Mo. 598.   Because the testator, by the use of the language, intended the children of the first marriage—we gather the intent from the will as a whole—for it can not be said for a moment that the property devised to Levina M. Gillham and her husband, Shadrack Gillham, and at their death to her children, and to William J. Gates and his wife, Eliza, and after their death to his children, was intended to go to any other children than of those parties.   Collins v. Hoxie et al., 9 Paige, 81; 2 Woerner's Amer. Law of Adm., p. 898.   Ella, being born out of wedlock—a bastard—could not inherit from John

Gates v. Seibert.

Gates, deceased, nor from Jacob S. Gates, her putative father. She was not of the class of children referred to by the testator, and certainly it was not the intention of the testator that his son Jacob should adopt, or by any *ex parte* proceeding not contemplated or intended by the testator, enlarge the class of children who were to be remaindermen. Marshall v. Railroad, 120 Mo. 275; Bent's Adm'r v. St. Varian, 30 Mo. 270; 3 Am. and Eng. Ency. of Law, 230, note 2; Cartwright v. Vawdry, 5 Ves. 530; Hicks v. Smith, 94 Ga. 817; Safford's Guardian v. Haughton's Est., 48 Vt. 236; Reinders v. Koppelman, 94 Mo. 343; Williams' Executors, p. 943; Gelstrom v. Shields, 16 Hun. 143; Lyon v. Lyon, 88 Maine, 395; Johnston v. Taliaferro, 45 L. R. A. 95. The intention of the testator should be the "Polar Star," and should prevail. Lang v. Timms, 107 Mo. 519; Reinders v. Koppelman, *supra*; Smith v. Bell, 6 Peters, 75 (cited and quoted from in Nichols v. Boswell, 103 Mo. 157); Cross et al. v. Hoch et al., 149 Mo. 325; Garth v. Grant, 139 Mo. 450. The word "child" or "children" in wills and deeds must be taken to mean legitimate children and can not be construed to include illegitimate children. Hicks v. Smith, 94 Ga. 809; Floyd v. Floyd, 97 Ga. 124; Cartwright v. Vaudry, 5 Ves. Jr. 530; Re Wells L. R. 6 Eq. 599; Re Ayles L. R., 1 Chan. Div. 282; Ellis v. Huston, L. R., 10 Chan. Div. 236; Shearman v. Angle, — Bail Eq. 351; 23 Am. Dec. 166; Kent v. Baker, 2 Gray, 535; Blacklaws v. Milne, 82 Ill. 505; Thompson v. McDonald, 22 N. C. 463; Grubbs' Appeal, 58 Pa. 55; Neil's Appeal, 92 Pa. 193; Woerner's Am. Law of Admin., vol. 2, sec. 422. Under a devise or bequest to children, as a class natural children are not included, unless the testator's intention to include them is manifest, either by express designation or necessary implication. Heater v. Van Arken, 14 N. J. Eq. 159; Collins v. Hoxie, 9 Paige 81;

Conner v. Pinckney, 3 Barb. Chan. 466; Flora v. Anderson, 67 Fed. Rep. 182; s. c., 75 Fed. Rep. 217; Johnson v. Taliaferro, 45 L. R. A. 95. "Children" as used in this will, is a word of purchase. Here the children of Jacob do not take as his heirs, but as a class designated by and in the mind of the testator at the time of the making of the will. The clause as to legitimacy is in the act as to descents and distributions, and does not apply for all purposes. Lincecum v. Lincecum, 3 Mo. 441; Dyer v. Brannock, 66 Mo. 419; Green v. Green, 126 Mo. 17; Lyon v. Lyon, 88 Maine, 395. The estate having vested prior to Ella's being legitimatized, she could not acquire an interest without divesting or taking from some one a previously vested estate or a part thereof. Killam v. Killam, 39 Pa. St. 120. The statute can not operate in this case, because there was a lawful marriage intervening between the birth of Ella Gates Coffman and the subsequent marriage of Jacob Snyder Gates and Mary J. Filley, the mother of Ella; and, therefore, the fiction of the law, which is the ground on which the legitimation rests— namely, that the subsequent marriage relates back to a time prior to the birth of the illegitimate child—can not be invoked in this case, in consequence of the intervening marriage, which renders such fiction impossible. Institution Laws of Scotland, note 6 to vol. 1, sec. 18; In re Wright's trust, 2 Kay & Johns, 395-604; Erskine Scottish Inst. B. I. Tit. 6, sec. 52; 2 Kent Com. (12 & 14 Ed.), *210 note C. (3) The declaration of the law marked "C," given on behalf of plaintiffs, should not have been given, for, even though the court might have found all of the facts as therein stated, yet before finding for plaintiff it should have further found that said Jacob S. Gates and Mrs. Mary J. Filley were married in some State or country where the common law as to bastards did not prevail. 2 Kent (5 Ed.), star p. 208, and note at foot thereof; 3 Washburn on Real Property (4 Ed.),

Gates v. Seibert.

secs. 31 and 32, p. 16; Ross v. Ross, 129 Mass. 243; Miller v. Miller, 91 N. Y. 320.

*C. N. Travous, J. W. McElhinney* and *Stewart, Cunningham & Eliot* for respondents.

(1)  The fifth clause of the will of John Gates gives a vested remainder to the children of Jacob S. Gates, as a class. It must be conceded by defendant that the effect of the present devise is to create a life estate in Jacob S. Gates, and that the gift to his children, if valid, is by way of remainder.   Passing for the time the question of the effect of the parenthetical gift to the wife, the first question to be determined is, what persons did the testator mean to describe under the term "children" of Jacob S. Gates.   The children of Jacob S. Gates are all the legitimate children of Jacob S. Gates; every person who has answered that description in his existence constituting a member of the class of persons so designated.   Waddell v. Waddell, 99 Mo. 342; Jones v. Waters, 17 Mo. 582; 2 Jarman on Wills, p. 168, sec. 1011.   "Under a gift to children of a person, his children by different marriages will generally be entitled."   "And it is not necessary to show that the testator had in view a future marriage (i. e., contemplated a second marriage), but only that the terms of the will are not wholly inconsistent with such a notion as necessarily to limit the generality of the word 'children.' "   2 Jarman on Wills, sec. 1005; Aubuchon v. Bender, 44 Mo. 560.   It being then established that the devise gave to Jacob S. Gates a life estate and that the remainder to his children, if valid, is a gift to all his children as a class, the next question to determine is whether that remainder in the children of Jacob S. Gates is contingent or vested. It seems plain that at the death of the testator, which occurred before the marriage of Jacob S. Gates to his first

wife, there were no persons who could answer the description of his children.   Hence, the remainder was then contingent and was supported by the life estate in Jacob S. Gates until a child was born to him, in whom the remainder at once vested as the representative of a class, subject to be opened from time to time to let in the rights of every additional member of that class who subsequently might come into existence.  This is the decision in Waddell v. Waddell above, and it follows the weight of authority as expressed in the text writers.   2 Jarman on Wills, p. 169 (*p. 1012).    The trend of authority in this State is altogether in favor of the vesting of interests.   One of the leading cases upon this subject is that of Farrar v. Christy, 24 Mo. 453, from which case through Collier's will, 40 Mo. 321, to the contest over the Lindell will, 100 Mo. 368, the Supreme Court of this State has constantly favored the vesting of estates.    (2) The devise does not conflict with the rule against perpetuities. Fearne, on Remainders, sec. 712, states that an estate for life may be limited to an unborn person.   It follows, of course, that there may be a remainder over permissible by law.   In sec. 706 he gives the rule against perpetuities in the following language:   "Executory interests . . . . . . . must be so limited that from the first moment of their limitation it may be said that they will necessarily vest in right, if at all, within the period occupied by the life of a person in being, that is already born . . . . . . . and an absolute term of twenty-one years afterwards . . . . . . . " The statement is not "vest in enjoyment" or even "vest in possession."    This rule is sometimes stated incorrectly.   The Supreme Court of Missouri, in the case of Lockbridge v. Mace, 109 Mo. 162, at page 167, used the words "vested in possession" on the authority of Washburn on Real Property.   We do not think that either the Supreme Court of Missouri or Mr. Washburn mean by the term "vest in possession" vest in enjoyment, or physical

possession. If so, the proposition is overthrown by a mass of authority. By vesting in possession is meant no more than vesting in ownership, a word which in its origin has precisely the same meaning. So far as the Missouri authority is concerned, it is clear that the court had before it a limitation which was too remote—that to the great-grandchildren, in the case of Lockbridge v. Mace. There the great-grandchildren were the unborn children of unborn children. It was impossible for the estate to vest in right within the life or lives of persons in being or twenty-one years after. There was no occasion, therefore, for the court to recognize any distinction between vesting in right and coming into enjoyment. The word "vest" is not appropriately applied to a present enjoyment or physical possession. It refers to the interest of the person, his right or title only. When the decisions, therefore, require an estate to be "vested" within a certain period, they simply mean that that it shall then be in the owner in such a manner that he can alienate it or dispose of it, which is the prime purpose desired by the rule against perpetuities. The courts have always held that vested remainders can be sold, conveyed and transmitted by inheritance. Hence, the rule against perpetuities has no application to vested remainders. In Am. and Eng. Ency. of Law, vol. 18, p. 348, the rule is stated, "vested interests are not subject to the rule against perpetuities, those only being affected which, contingent at their creation, may become vested at a future time." "It is necessary to remember that an estate which is contingent on its creation may be such that it must become vested within the period of the rule." The case of Donohue v. McNichol, 61 Penn. 73, cited in the note (p. 248), evidently rests upon the form of the statute in Pennsylvania, and it has been qualified and dissented from in later cases and by text writers. See Gray on Perpetuities, secs. 206, 207; 1 Jarman on Wills

(6 Ed.), 280.    And it will be observed in this connection that in any event the interests of the children of Jacob S. Gates are completely ascertained at the moment of his death and are, therefore, fully within the limits of the rule.    See 2 Washburn on Real Property (4 Ed.), pp. 541, 224.    "If a remainder is vested, that is, if it is ready to take effect, whenever and however the particular estate determines, it is immaterial that the particular estate is determinable by a contingency which may fall beyond a life or lives in being.  For instance, if an estate is given to the unborn child of A until he dies or changes his name, and then to B and his heirs, B has a vested remainder, for he will take the estate whether the child dies or changes his name, although the contingent determination before the child's death depends upon an event which may not take place until beyond the limits prescribed by the rule against perpetuities."  "So a remainder to a person ascertained and his heirs, after a term of years, however long the term or whatever be the conditions to which the term is subject, is not too remote."    Gray on Perpetuities, sec. 209.    At common law it was not unusual to create terms for ninety-nine or even a thousand years. The fee simple title, nevertheless, remained subject to the ordinary rules of disposition, though manifestly the enjoyment of the premises might throughout the whole period be subject to the term for years and far beyond the limits of the rule against perpetuities.    "A devise in remainder to a class will vest in the first of the class who comes to answer the description of the will, opening to admit all the subsequent members of the class, then preserving the estate, although some members of the class may not come into existence or attain the requisite age within the limits of the rule against perpetuities."    Redfield on Wills, star p. 571; Mogg v. Mogg, 1 Mer. 654; Festing v. Allen, 12 M. and M. 279; Alexander v. Alexander, 16 C. B. 59.  "It seems to be settled

that a devise to an unborn person for life is valid, and that an executory devise to the issue of such unborn person will be valid if the will provides that in order to take they must come into existence during the continuance of lives in existence, and twenty-one years. And a remainder after the termination of such life estate is valid, 'if made in favor of persons competent to take." Redfield on Wills, star p. 573; 1 Jarman, 262-264; Gadell v. Palmer, 7 Blight. 202. An unborn person at date of settlement may be made tenant for life. Chance on Powers (1231); Sugdon on Powers, 429; Robinson v. Hardcastle not agreed with. "A vested remainder stands on very different ground from a contingent remainder or an executory devise. Only the enjoyment is deferred, but the vested remainder is assignable, and can be levied on and sold for debt, and the owner being known, it does not stand in the way of aliening the whole fee. Hence, some of our States have held that the rule against perpetuities is inapplicable to a vested remainder." Deblitz on Titles, vol. 1, p. 176; Dulaney v. Middleton, 72 Ind. 67; Lunt v. Lunt, 108 Ill. 307; Oldmixon's Appeal, 147 Pa. St. 228; In re Cooper's Estate, 150 Pa. St. 576. (3) The effect of the subsequent marriage of Jacob S. Gates and Mary J. Filley was to legitimate their child, Ella Gates, and to bring her from that time into the class of the children of Jacob S. Gates, mentioned in the will.

VALLIANT, J.—This is an action of ejectment coming from the circuit court of St. Louis county.

The land was owned by John Gates in his lifetime who died testate in 1872, leaving surviving him his widow, Levina Gates, and three children, to-wit: Jacob S. Gates (then unmarried), William J. Gates (married), Levina H., wife of Chadwick Gillum. By his will John Gates disposed of all

his property, giving most of it to his children. In the first clause of the will the testator directs that his debts he paid, in the second he provides for his widow, and in the third, fourth and fifth for his three children. The following extracts from the will are sufficient for the purposes of this cause:

"Third. I hereby give and bequeath to my son William Jasper Gates and his wife Eliza, for and during their lifetime and after their decease to his children [description of property].

"Fourth. I hereby give and bequeath to my daughter Levina Maria Gillum and her husband Chadwick Gillum for and during their lifetime and after their decease to her children [property described].

"Fifth. I hereby give and bequeath to my son Jacob Snyder Gates (and his wife if he should marry) and after their decease to his children" the land in suit.

In 1873, after the death of the testator, his heirs deeded all their interest in the land covered by the fifth clause to Jacob S. Gates under the idea that that clause was void.

In 1876 Jacob S. Gates married Lizzie A. Cool, who gave birth to a child in September, 1877, and died the next month; the child died the day after its mother. Jacob S. Gates, in November, 1878, married Mary J. Filley in St. Louis county. At the time he married his second wife she had by him an illegitimate child then about three years old, whom at and after the marriage they acknowledged as his child and ever afterwards treated as their legitimate offspring. The child is now Ella Gates Coffman, one of the plaintiffs in this suit. After this marriage there were two children born to them, John J. Gates, one of the plaintiffs here, and Jacob Snyder Gates, Jr., born February 8, 1882, and died July 8, 1882. Jacob S. Gates's wife died in 1884, leaving surviving her her husband and two children, Ella

and John, these plaintiffs. In 1886 Jacob S. Gates and his mother executed a deed of trust to secure a debt of $10,000, which was afterwards duly foreclosed and at the sale James C. Ghio became the purchaser; Adam Seibert et al., defendants here, are in possession of the land as tenants of Ghio.

Those facts being shown, the court at the request of the plaintiffs gave the following declarations of law:

"(A). The court declares the law to be that if it finds from the evidence that John Gates, at the time of his death, owned the real estate described in the petition; that he died in the year 1872, leaving Levina Gates, as his widow, surviving him, and a son, Jacob Snyder Gates; that Levina Gates died before Jacob Snyder Gates, and Jacob Snyder Gates died about the year 1888; that the land mentioned in the will of John Gates as part of the 'Dr. Bates' farm and given to Jacob Snyder Gates, his wife and children, under the fifth clause thereof, is the same property as that described in plaintiffs' petition; that Jacob Snyder Gates was twice married and had by his first wife a child, which lived but a short time, and that his said wife and child both died before Jacob Snyder Gates, and before any second marriage which the court may find was contracted by him; that the said Jacob Snyder Gates thereafter was lawfully married to Mary Jane Filley, and that the plaintiff Ella Gates Coffman and John J. Gates, are the sole living children and descendants of Jacob Snyder Gates, and are legitimate children, as such may be described in other declarations of the court; that the said Mary Jane, wife of Jacob Snyder Gates, died before the commencement of this suit, and before the death of said Jacob Snyder Gates; that there was born to Jacob Snyder Gates and his wife, Mary Jane, after their marriage and the birth of plaintiff, John J. Gates, another child, which died an infant before the death of either of its parents; and that the defendants, Adam and William Seibert, were, at the commencement of this suit,

in possession of the real estate described; it will render a verdict for the plaintiffs for the recovery of an undivided eleven-sixteenths interest in the land described in the petition and claimed by them, together with such amounts as damages as it may determine under the other declarations made by the court.

"(B). The court declares the law to be that if it finds for the plaintiffs for the recovery of an eleven-sixteenths interest in the land described in the petition, it will assess against the defendants, as damages, a sum of money which will equal two-thirds of the reasonable net rental value of the use, occupation and enjoyment of the premises from the 20th day of April, 1893, to the present time, as originally sued for, and it will in its verdict fix the value of the monthly rental of eleven-sixteenths of the property at the present time.

"(C). The court declares the law to be that if it finds from the evidence that the plaintiff, Ella Gates Coffman, was the daughter of Jacob Snyder Gates and Mary Jane Filley, and born prior to November 12, 1878; that on said day, November 12, 1878, said Mary Jane Filley and Jacob Snyder Gates were married; and that thereafter Jacob S. Gates recognized the said Ella to be his child by maintaining her in his house and home, treating her as such, and holding her out to the community in which he lived as his child; then the court will find that the said Ella is the legitimate child of Jacob S. Gates.

"(D). The court declares the law to be that the meaning of the fifth clause in the will of John Gates is, that the farm mentioned in that clause should belong to Jacob S. Gates and such person as might be his wife, during their joint lives, and to the one of them who survived the other during his or her life, and that subject to these life interests the children of Jacob S. Gates should become and be the

Gates v. Seibert.

owners in fee simple of the property; that the children of Jacob S. Gates should own such property in equal shares and that the shares of any of his children who might die before him should fall by inheritance to the heirs of such child at its death."

The court refused the request of the defendant that: "The court sitting as a jury declares the law to be that upon the pleadings and evidence adduced in this action the plaintiffs are not entitled to recover, and the finding and verdict must be for the defendants." The finding and judgment were for the plaintiffs and the defendants have duly appealed.

The points of difference in the case are in the construction of the will, and the effect of the after-marriage of the parents of the illegitimate child and their recognition of her.

I. It is contended in behalf of defendants that the fifth clause of the will under which the plaintiffs claim is void because it violates the rule of law against perpetuities. The proposition is that under this clause of the will it was possible that the estate attempted to be limited to the children of Jacob S. Gates might not "vest in possession" within the lifetime of a person in being, and twenty-one years and ten months thereafter. Because, it is said, it was not impossible that Jacob Gates, who was unmarried at the time the will took effect, might remain so for twenty years or more and then marry a woman who was not born when the testator died, and who might survive him for twenty-one years and ten months and thereby postpone the vesting of the remainder to a period beyond the utmost of the law's indulgence. Authority is quoted to say: "It is not enough that a contingent event may happen, or even that it will probably happen, within the limits of the rule against perpetuities; if it can possibly happen beyond those limits, an interest con-

ditioned on it is too remote." [Gray on Perp., sec. 214.]

The only point in the proposition as stated by the learned counsel for defendants with which we do not agree is that the limitation must be of such character that it will "vest in possession" within the period prescribed. It must be of such a character that it will become a vested estate, if at all, within the period, but not necessarily vested in possession. An estate is vested in possession only when there is a right of present enjoyment; it is vested in interest when there is a present fixed right of future enjoyment. One of the tests, though not exclusive, is the right of alienation. Some of the authorities hold that the policy of the law against clogging the free alienation of estates is the reason of the rule against perpetuities. [1 Wash. Real Prop. (5 Ed.), 115.] Under our law there is no restriction on the alienation of a vested remainder. The following quotation from Gray on Rule against Perpetuities, states the law correctly: "Sec. 205: A vested interest is not subject to the rule against perpetuities, for *ex vi termini* it is not subject to a condition precedent. Reversions and vested remainders . . . . . . . . are, for the purpose of the rule against perpetuities, to be considered vested interests. Sec. 206: Therefore an estate which, though now a contingent remainder or executory devise, must, if it is to take effect at all, become a vested interest within twenty-one years after lives in being, is good." "Sec. 209: If a remainder is vested, that is, if it is ready to take effect whenever and however the particular estate determines, it is immaterial that the particular estate is determinable by a contingency which may fall beyond a life or lives in being."

In Lockridge v. Mace, 109 Mo. 167, there is a quotation from 2 Wash. R. P. (5 Ed.), 760, in which occurs the expression: "The limitation, in order to be valid, must be so made that the estate not only may, but must, vest in possession within the prescribed period." There was no question

in respect to a vesting in possession as contrasted with a vesting in interest in that case, and there is nothing in the opinion on that subject.    In that case there was an attempted devise to the testator's wife for life, remainder to his son (then seven years old) for life, remainder to his son's children for life, remainder to his son's grandchildren in fee.    This court held the devise to be void.    Even in the text quoted from, this particular point was not under discussion, and if the words "in possession" had been omitted, the principle that the law writer was emphasizing, to-wit, that the estate not only may, or probably will, but must vest within the period, would have been just as clearly stated.    The two cases cited in support of the text, Smith's Appeal, 88 Pa. St. 492, and Wheeler v. Fellowes, 52 Conn. 238, sustain the proposition that the estate must vest within the period but not that it must vest in possession.    The language used in the Pennsylvania case, *supra*, is:  "Future estates limited upon a life estate which are not sure to take effect within twenty-one years and the usual fraction, after the determination of the life estate, are void in their creation."

That the eminent law writer quoted from never intended to lay down the doctrine that the future estate would be void if there was a possibility that it might not vest in possession during the period prescribed by the rule, is shown by the following quotations from the same author:  "An executory devise, in order to be valid, must be so limited that it must take effect, if at all, within a life or lives in being, and twenty-one years and a fraction after, in order to avoid what are called perpetuities in estates.    But this does not apply to remainders whether contingent or vested; and one reason is," etc.    [2 Wash. R. P. (5 Ed.), 605, 606.]    There is really no authority for the proposition that the future estate must take effect in possession within the period prescribed by the rule.

In the case at bar the limitation over was to the children of Jacob S. Gates, which of course, as he was then unmarried, was contingent upon his marrying and having a child; but the limitation was such that if he should have a child the estate in remainder would vest in that child certainly within ten months after the death of the father, even though the mother survived him more than twenty-one years. Therefore we hold that the fifth clause of the will was not repugnant to the rule against perpetuities.

II. We see no difficulty in arriving at the intention of the testator in the fifth clause of the will, even if we read that clause alone, but reading it in connection with the other clauses of the same character wherein the use of like terms are made in providing for the children of his other children, the meaning is beyond question.

The testator had but three children and in providing for them and their children he uses in each of the three clauses of the will language identical with that in the other two to express the character of the devise. In the third clause the language is:"To my son William Jasper Gates and his wife Eliza for and during their lifetime and after their decease to his children" (not their children). In the fourth clause it is: "To my daughter Lavina Gillum and her husband Chadwick Gillum for and during their lifetime and after their decease to *her* children." And in the fifth clause it is: "To my son Jacob Snyder Gates (and his wife if he should marry) and after their decease to *his* children." In each of these clauses the class designated as the remaindermen is the children of the son or daughter named therein, and although the wife and husband named was each provided for in the joint life estate, yet the class to take as remaindermen was not limited to the children of the testator's son or daughter by that wife or husband but to all who would fill the description of children of that son or daughter. And that he con-

templated that each class might be increased as births might occur, is shown by his use of the same words of description in reference to the children of Jacob, who was unmarried, that he used in reference to those of his married children.

The limitation after the life estate in the fifth clause of the will was a contingent remainder until the marriage of Jacob and the birth of a child to him, then the remainder vested in that child as constituting the class named, his individual share being liable to diminution, as the class might increase, by the opening of the estate to let in another person who might thereafter come filling the description. When such an estate becomes vested, when one of the class dies intestate, his share descends to his heirs at law, subject to like diminution by increase of the class as it would have been if he had lived. [Aubuchon v. Bender, 44 Mo. 560; Waddell v. Waddell, 99 Mo. 338; 2 Jarman on Wills (6 Ed.), pp. 161-169.]

III. The remaining point in controversy relates to the interest of the child born out of wedlock but legitimated by the after marriage of the parents and the father's recognition of her as his child.

Opposing her claim it is first contended that on the birth of the first child to Jacob S. Gates, the remainder vested in it, and upon its death, before the birth of another child, the estate descended to Jacob the father as sole heir to his child. But the limitation as we have seen was to a class, and although on the birth of the first child the limitation ceased to be a contingent and became a vested remainder, yet it vested in the child as filling the class description, his own share being subject to diminution as the class might thereafter increase; and upon his death it descended to his heir who took subject to the same hazard of diminution. Therefore if this legitimated child could have claimed a share in the estate as against the first child in whom the remainder

vested, if he had not died, she may claim the same share as against the heirs of that deceased child.

It is immaterial whether the right of Ella, the legitimated child, to come into the class described as children of Jacob S. Gates, be determined as of the date of the marriage of her parents or that of her birth, because if she can come in at all, her interest is the same whether her status bears one date or the other. If she became one of his children in the sense in which the law uses that term on the day of his marriage with her mother, she would then have the same right in this estate as if she had been born in wedlock on that day. When the law uses the word children it means legitimate children, and when that word is used in a will or a deed it is to be understood as used in that sense, unless something else appears to indicate that a different meaning was intended. Our statute declares that children born out of wedlock whose parents afterwards marry and the father recognize them as his, "shall thereby be legitimated." The word is used without qualification or restriction. There are no degrees of legitimacy, a child is either legitimate or it is illegitimate, and whether it is one or the other depends upon whether or not it comes within the requirements of the law to make it legitimate. A legitimate child under our law is one born in lawful wedlock or of a widow within ten months after the death of her husband, or born before the marriage of its parents who afterwards marry, and receives the recognition of its father; and one such child is just as legitimate before the law as the other. The statute has made them equal before the law and the courts can not make them unequal.

The main force of the argument of the learned counsel for appellants on this branch of the case is directed to their proposition that the statute which makes ante-nuptial children legitimate is a part of the statute of descents and distri-

bution and is limited in its effect to inheritance in case of intestacy, having no application to those who claim to take as purchasers under a will.

The two Missouri cases on which the counsel chiefly rely are Lincecum v. Lincecum, 3 Mo. 441, and Dyer v. Brannock, 66 Mo. 391. In the Lincecum case the court was construing a clause of the statute in relation to descent and distribution which was: "The issue of all marriages deemed null in law, or dissolved by a divorce, shall nevertheless be legitimate." The parties claiming the benefit of that statute were children of a marriage which took place before the enactment of the statute, and which was illegal because the man already had a lawful wife by a former marriage. It was urged against the claim of the children of this second marriage that the statute was not intended to apply to children of illegal marriages that had taken place before the passage of the law; and also that reading the statute in connection with a provision in the law relating to divorce, which was to the effect that a divorce of the parents should not affect the legitimacy of the children except in cases where the marriage is declared null from the beginning, necessarily excepted the children of the second marriage in that case from the benefit of the statute in question. But the court decided both points in favor of the children of the illegal marriage.

In discussing the second point, that is, the supposed effect of the divorce statute on the statute relating to children of illegal marriages, the court uses this language: "In the first place we are not prepared to admit that these two acts are so far *in pari materia* that they ought to be taken as one act; the one is an act solely for the purpose of pointing out who shall take the estate of an intestate. The other is essentially an act to regulate the granting of divorces. It is

true the subject of legitimacy is mentioned in both. In the first act it is mentioned for the purpose alone of pointing out the children who shall take a distributive share of the intestate. In the latter act the subject is only mentioned to prevent the fact of a divorce changing in any wise the capacity of the issue of children when it is granted." It is this language which the learned counsel deem to support their contention that the children there mentioned are legitimate in case of intestacy but bastards for all other purposes. But there was no question of that kind before the court; the case was one of intestacy only, and the question was, could the children inherit? And the court said in effect that this provision was put in the statute of descent and distribution for that very purpose. That was all that was intended to be said and all that the court could with authority in that case have said. The further language of the court in the same connection is: "Another thing in this case is, that where a person is once clearly and positively legitimate, he ought not to be bastardized by implication or construction. This rule applies with force to this case. The act of descents and distributions clearly make those children legitimate, and being once clearly so, if they are holden to be otherwise, it can only be by implication, argument and construction." Surely it would be strange if the court could in one clause of the opinion be understood to say that the children were legitimate for the purpose of inheriting in case of intestacy but bastards for all other purposes, and in another clause of the same opinion say that they were "clearly and positively legitimate."

The other Missouri decision relied upon to sustain the contention of appellants, Dyer v. Brannock, *supra*, deals mainly with questions as to what constitutes a valid marriage, common law or statutory, and also the rights of children of illegal marriages to inherit. There was no will in the case;

it was a question of inheritance in a case of intestacy. The contention in opposition to the right to inherit was, the child having died and the father claiming to inherit from it, that whilst the statute would enable the child to take either from her father or mother and to transmit the inheritance to descendants, yet it must be so restricted as not to allow her to transmit the estate to ascendants, especially not to the guilty father. The court said: "No such restriction is found in the law. The act simply declares the child legitimate, and the same act provides for the transmission of the estate on specified contingencies, from the child to the father. It is in the act regulating descents and distributions, that this section concerning the legitimacy of the issue of null marriages is found, and it is for the purposes of this act that the declaration is made. We have no authority, upon grounds of public policy or for the promotion of private morals, to make restrictions or exceptions which the Legislature has not seen proper to make."

That is all we can find in that decision bearing on the point contended for by appellants, and whilst it does say that that clause was put in the statute of descents and distributions for the purpose of the act, yet it is far from saying that such children are to be held *quasi* legitimate for that purpose but illegitimate for all else, and if it had said so it would have spoken upon a subject not in the case. The language instead of being susceptible of that construction seems to be clearly to the contrary, declaring the act conferring the legitimacy to be without restriction.

Green v. Green, 126 Mo. 17, is also referred to. The only point decided in that case was that under the statute, sec. 4475, R. S. 1889, declaring children of an illegal marriage legitimate, it was not necessary in order to establish their legitimacy that there should be a decree of court declaring the marriage null.

The Maine case to which we are referred, Lyon v. Lyon, 88 Me. 395, was a will case. The testatrix had made a bequest to a class designated as "my nephews and nieces who shall be living at the time of my decease." The question was whether an illegitimate child of parents who afterwards intermarried would come in that class, and the court held that it would not. But the statute of Maine was very different from our statute; it did not declare such children legitimate, but only provided that they might inherit from their father as well as from their mother. The language of the Maine statute is: "An illegitimate child born after March 24, 1864, is the heir of his parents who intermarry. And any such child, born at any time, is the heir of his mother. And provided the father of an illegitimate. child adopts him into his family, or in writing acknowledges before some justice of the peace, or notary public, that he is the father, such child is also the heir of his father. And in either of the foregoing cases, such child and its issue shall inherit from its parents respectively, and from their lineal and collateral kindred, and those from such child and its issues, the same as if legitimate." (Laws of Maine, 1887, p. 11.) In that statute the child is treated as illegitimate and is so called; the illegitimate child whose parents never intermarry but whose father acknowledges it as prescribed, is given the same right of inheritance that is given to the illegitimate child whose parents intermarry. The statute does not in terms or by inference place upon either the seal of legitimacy, but says it may inherit "the same as if legitimate;" whereas our statute says "they shall thereby be legitimated."

The law of Scotland and continental Europe on this subject to which reference is also made has a theory of its own altogether different from that of our law. Under that theory which was derived from the civil law, when the parents of an illegitimate child intermarried, the law resorted to a fiction

under which it shut its eyes to the true date of the marriage and enforced the presumption that the marriage was antecedent to the birth of the child. But as nothing more substantial than a presumption could be evolved out of that fiction, that presumption was necessarily overthrown when the fact of an intervening marriage occurred. That law, founded on a charitable fiction, would not carry its enforced presumption so far as to invalidate a lawful intervening marriage, or bastardize the legitimate children thereof. Hence if that were our law governing this case; the marriage of Jacob S. Gates to Lizzie A. Cool in 1876 would prevent this artificial presumption that he was married to his second wife before the birth of Ella; since to indulge that presumption would be to invalidate his first marriage. But that is not our law. Ours is a straightforward statute, indulging in no fiction, neither hiding facts nor misnaming things, simply declaring that an illegitimate child whose parents afterwards intermarry shall thereby become legitimate, not *quasi* legitimate, nor possessing some of the attributes of legitimacy, but legitimate.

The learned counsel for appellant have traced this statute through our revisions back to that of 1825, where it appears as in the act of January 11, 1822, entitled, "An Act to direct descents and distributions," and from that fact argue that its effect was intended to be limited to the general purpose indicated in the title to that act. But whilst the statute which was the subject of discussion in the case of Lincecum v. Lincecum, *supra,* that is, the statute relating to the children of illegal marriages, did originate in the act of 1822 above named, yet the statute we are now dealing with goes back to an earlier date, and when it was first introduced into our law it was in an act relating to both wills and descents. Its history is as follows:

On January 24, 1815, the General Assembly of the

Territory of Missouri passed an act entitled "An Act direct-
ing the probate of wills and the descent of intestates' real
estates and distribution of their personal estates and for
other purposes therein metioned." Section 16 of which was
as follows: "All *posthumous* children shall in all cases what-
soever inherit in like manner as if they were born in the life-
time of their respective fathers. And when a man shall
have one or more children by a woman, and shall afterwards
intermarry with such woman, such child or children if recog-
nized by him shall be thereby legitimated, and capable of in-
heriting."

That is the first appearance of the provision in question
in our law, and as we see, it came in under an act relating
both to wills and estates of intestates, and was contained in
the same section that declared the rights of *posthumous* chil-
dren. So the law stood until the second session of the first
General Assembly in 1821-1822, when the subjects of wills
and descents were divided and an act was passed entitled,
"An Act concerning wills and testaments," approved Decem-
ber 1, 1821, and an act entitled, "An Act to direct descents
and distributions," approved January 11, 1822, and the
provisions of the act of 1815, *supra,* both as regards *posthu-
mous* children and children whose parents afterwards inter-
marry, were carried into the latter act, though in separate
sections, and so they were carried forward into the revision
of 1825 and thence through all the revisions down to the
present. Thus we see that although it now appears
in our Revised Statutes under the caption of Descents
and Distributions, and very appropriately so, yet no
argument can be drawn from that fact that it was
conceived by the lawmakers to be limited to estates
of intestates, because its first introduction was in an
act that related to wills as well. With as much force could
it be argued that *posthumous* children could not take under a

devise to a class as children.  In the act of 1815 the language was that such children "shall thereby be legitimated and capable of inheriting," but when the subject came up again in 1822, the Legislature evidently concluded that when the children were declared legitimate without words of restriction, it would be idle to specify any particular attribute of legitimacy and they were to possess, and they left off the words "and capable of inheriting" and in that form it has come down to us to-day.  So we conclude that such children are legitimate and that is all that can be said of them.   We hold, therefore, that upon the marriage of her parents, Ella became one of the children of Jacob S. Gates within the meaning of the fifth clause of the will, and that thereupon the estate in remainder, which was then vested in Jacob S. Gates by descent from his deceased child as the representative of the class of remaindermen, opened and let her in as it afterwards opened and let in the after-born children of the second marriage.

Counsel for the plaintiffs in their very able brief have collected authorities on this subject, both English and American, which fully sustain the right of the plaintiff Ella Gates Coffman to a share in this estate as being one of the legitimate children of Jacob S. Gates.  [In re Andros, 24 Ch. D. 637; In re Gray's Trusts, 3 C. C. L. R. 88; Carroll v. Carroll, 20 Texas, 731; Sleigh v. Strider, 5 Call's Rep. (Va.) 439; McKamie v. Baskerville, 86 Tenn. 459.]

IV.   The criticism of the instruction marked "C," that it omits to require the court to find that the parents of Ella were married in a State where the common law had been changed as it has in Missouri, was doubtless induced by an oversight of the fact that the record in this case shows that the marriage occurred in this State.

The criticism of instruction marked "A" is that it omits to require the court to find that Gates's child by his first

wife survived its mother.   That was an undisputed fact in the case, indeed it was a fact conceded to defendants in the recognition of the interest that Jacob S. Gates inherited from his first child, and is assumed in that instruction by conceding that interest to defendants.

The circuit court took the correct view of this case, and its judgment is affirmed.   *Gantt, C. J., Brace* and *Robinson, JJ.*, concur; *Sherwood, Burgess* and *Marshall, JJ.*, dissent.