JOSEPHINE TALBOT PARKER BRISBIN, Appellant, v. CHARLES S. HUNTINGTON and HADLEY M. HENLEY, Trustees under the will of James Monroe Parker, deceased; FRANK FRAISSINET, now known as and called FRANCIS TADMIR PARKER, a minor; PAULINE FRAISSINET, guardian of said Frank Fraissinet; ALEXANDER TULSI PARKER, a minor, and WALTER A. HANSEN, his guardian.

**Marriage contract:** EVIDENCE. The evidence in an action to construe a will is reviewed and held insufficient to establish a marriage contract under the law of Nebraska defining marriage.

**Recognition of illegitimate child:** EVIDENCE. On the question of whether a putative father recognized his illegitimate child, the evidence is reviewed and held insufficient to establish recognition.

**Wills:** CONSTRUCTION OF "LAWFUL ISSUE." The term "lawful issue" as used in a will should be construed according to the inten-

tion of the testator as gathered from the language of the will and such extrinsic facts as may properly be considered, and while generally it may mean "heirs of the body or lineal descendants" it may be used in a restricted sense. In construing the will in question "lawful issue" is held to be synonymous with "child" and to apply only to such as are born in lawful wedlock.

**Bastards:** EFFECT OF RECOGNITION: LAWFUL ISSUE. Code section 3385 which provides that an illegitimate child which has been recognized in writing by the father as his child shall inherit from him, is a statute of descent only and does not legitimate the child so that he may take under a will giving property to his father and his "lawful issue," which is construed to mean lawful children.

*Appeal from Scott District Court.*— HON. P. B. WOLFE, Judge.

WEDNESDAY, APRIL 12, 1905.

ACTION to construe a will. Both parties appeal — that of plaintiff being first perfected.— *Reversed.*

*Lane & Waterman,* for appellant.

*Hamilton & Maxwell, Chamberlain & Petersen,* and *Cook & Dodge,* for appellees.

LADD, J.— J. Monroe Parker departed this life in 1892, leaving, him surviving, three children. One of these died unmarried and without issue shortly after the father, and by the terms of the latter's will his interest in the estate passed to the other two, William Frederick Parker and the plaintiff. William Frederick died in 1902, and the important questions involved are whether he was ever married, and, if not, whether the defendants Francis Tadmir Parker and Alexander Tulsi Parker, or either of them, are entitled to one-half of the income derived from the estate of J. Monroe Parker. His will is somewhat lengthy, and only those portions directly involved need be set out. By the

tenth clause the testator gave and devised to three trustees, and " to their successors in the trust here created, in trust for the uses and purposes hereinafter specified," numerous tracts of land in Iowa and Nebraska, and directed that they manage the same and lease the several parcels for terms not exceeding five years at any one time, or for longer periods upon the written consent of the *cestuis que* trust or their guardians, and that after the payment of taxes, insurance, and other necessary expenses, and certain charges thereon, the remainder of the net income to be paid by the trustees to his three children, " share and share alike, as long as they may live." The trust is to continue as long as any of his children live, and then terminate.

If any one of my said three children should die, not leaving lawful issue surviving, the share of the income which would go to such child, shall go to the surviving child or children, share and share alike. But if any one of said children should die, leaving lawful issue, then the child or children so surviving shall take the share of the income which the father or mother would have taken had he or she survived, including the share which would have gone to the said father or mother by reason of the death of any one of my said children without lawful issue.

Thereupon the said real estate pertaining to the said trust, including any accumulations or undivided income thereof, shall be taken and held absolutely in fee simple, by the surviving lawful issue of my said three children. The undivided one-third part of said property, shall be taken by the lawful issue of each one of my said children, share and share alike. If any one child or any children of my said children, shall have died before the termination of said trust, leaving lawfully begotten children, or more remote descendants, lawfully begotten, then such children, grandchildren or more remote descendants shall take the share which would have been taken by their parent had he or she survived. If any one of my children should die leaving no children, grandchildren or more remote descendants lawfully begotten, then the share which would have been taken by such child, or other descendant, shall be divided among the children, grandchildren or more remote descendants of

my other children, on the same basis as hereinbefore provided.

I.   Whether these children, Francis Tadmir and Alexander Tulsi, shall take the share of the income which would have gone to William, had he lived, depends upon whether they are to be regarded as his lawful issue.   If he was married to their mother in 1886 or 1887, as she contends, their right to take as such is not questioned.   But a careful examination of the evidence has convinced us that she was never his wife. These parties lived at Florence, Neb., and, under the laws of that state, " marriage is considered a civil contract to which the consent of parties capable of contracting is essential."   Section 1, chapter 52, Statutes of Nebraska, 1903. No particular form or ceremony was necessary.   All required is that the minds of the parties met in mutual consent.   *University of Michigan v. McGuckin,* 64 Neb. 300 (89 N. W. 778, 57 L. R. A. 917) ; *McFarland v. McFarland,* 51 Iowa, 365.   And this is accomplished if they lived together, and, in so doing, intend to sustain the relation of husband and wife.   *Eaton v. Eaton,* 66 Neb. 676 (92 N. W. 995, 60 L. R. A. 605).   But neither such intention nor consent can be inferred from cohabitation alone.   *Grimm's Appeal,* 131 Pa. 199 (18 Atl. 1061, 6 L. R. A. 717, 17 Am. St. Rep. 796) ; *McKenna v. McKenna,* 180 Ill. 577, 584 (54 N. E. 641). *" Consensus non concubitus facit matrimonium,"* is an ancient but generally accepted maxim.

Aside from cohabitation, the acts of the parties usually resorted to for proof of the status are singularly wanting in this case.   They were never reputed among their acquaintances as married; never treated each other as husband and wife, nor spoke of each other as such in the presence of others; did not give the father's name to the offspring until shortly before his death; and, though affectionate to the elder, he appears never to have referred to him as a son until about eleven years of age.   True, Mrs. Fraissinet tes-

1. MARRIAGE CONTRACT:   evidence.

tied that she had been secretly married to deceased in 1886 or 1887, but their conduct up to the time of his death, in 1902, completely refutes her claim. She worked at his house as a servant considerable of the time for several years, and in 1886 engaged to serve as his housekeeper at a weekly wage of $4. Parker's books indicate that she continued in this relation until his death. He was scrupulous in crediting her with wages, and charging her with all money paid or time lost, to the last. According to her story, she had become engaged to marry one Wendt, and, shortly after her return to Parker's house, induced him to allow the ceremony to be celebrated there. Not until the wedding guests had been invited was Parker's wooing said to have been begun. Two or three days sufficed, and Wendt was bidden to stay away, for she had agreed to take Parker in his stead. The guests came. The feast was served. If the groom was present, no one knew it, and no one was curious enough to inquire. There was no need of ceremony, and he did not believe in any, so she was informed, and they retired together. Francis Tadmir was born in 1888, but was known until 1901 as Frank Fraissinet. She continued as Pauline Fraissinet, and was never introduced as his wife, did not sit at his table — at least, when guests were present — and occupied a separate room. She never accompanied him in his travels or to entertainments. Possibly they were at the World's Columbian Exposition in 1893 together, but, if so, they traveled apart both ways. To no one did she ever represent herself other than Parker's employé, and as such she was treated by those at the house, whether guests or laborers. After 1894 she accepted a deed from him in which he described himself as single, and her as Pauline Fraissinet. In 1898, in a deed to one Peterson, he again recited that he was unmarried. And in 1901, in conveying the place where he lived, the grantee is named as " Francis Tadmir Parker, known as Fraissinet, son of William Frederick Parker and Pauline Fraissinet; said Francis Tadmir Parker being legit-

imate according to the laws of the State of Nebraska." This was given to Francis, with instructions to have his mother retain it for him, which she did, until the grantor's death. Even a bequest contained in his will is to " Pauline Fraissinet," without intimation of a marital relation. The evidence is conclusive, as it seems to us, that Parker did not suppose he was married, and the deed to Francis was manifestly intended as a written recognition of this boy as his son. It is inconceivable that he would have so referred to this woman or her son, had she been his wife, and he born in wedlock. To all this should be added the testimony of a credible witness of her admission, subsequent to his death, that they were never married. She denied this, and further explained that the reason for keeping the marriage secret was that Parker did not wish his father to learn of it. But she does not explain why the secret was kept for ten years after the father's death. Was it a matter of preference that she passed as William's mistress, rather than his wife? Two witnesses testify to statements of deceased shortly before his death to the effect that he was living with Mrs. Fraissinet under a common-law marriage, but these are so inconsistent with the solemn written declarations already referred to, and his entire course of life up to the very moment when he is said to have made them, as to seem utterly incredible. It has not been our purpose to detail all the circumstances found in the record, but to set out enough to indicate the grounds upon which we base our conclusion. Though these parties had lived in the same house, and doubtless cohabited, they never pretended to be husband and wife, did not treat each other as such, and were never so reputed among acquaintances. They were content even to have their offspring bear the mother's name as proof of their meretricious relation. They were never married, and their children, when born, were illegitimate.

II. The evidence mentioned sufficiently indicates that William Federick recognized Francis Tadmir Parker, in

writing, as his son, prior to his death. This is conceded.

2. RECOGNITION OF ILLEGITIMATE CHILD: evidence.

There was no such recognition of Alexander Tulsi, and omission to mention him in either the deed to Francis or the will certainly tends to show no recognition was contemplated. It appears that, when the child was born, William Frederick assisted the nurse, and later said to an old lady who called, " That's my baby." At another time, when the mother chided the child for calling him " papa," Parker said, " Let him call me ' papa ' if he wishes." At another time he said to one Hamilton that " the two children born under this roof are mine, and I am glad of it." Francis heard him refer to his brother as Alexander Tulsi Parker, and to him he said, " Take care of your mother and brother." Aside from these admissions, he paid little or no attention to the child. Manifestly, the evidence falls far short of establishing either general or notorious recognition. *Markey v. Markey,* 108 Iowa, 373; *McCorkendale v. McCorkendale,* 111 Iowa, 314; *Duffy v. Duffy,* 114 Iowa, 581.

III. The more troublesome question is whether the language of the will includes the natural children of William Frederick Parker, when so recognized by him as to entitle

3. WILLS: construction of " lawful issue."

them to inherit. It will be noted that only his " lawful issue " are to take the income. The term " issue " is somewhat ambiguous; its true meaning depending upon the intention of the testator, to be ascertained from the language of the will, in connection with such extrinsic circumstances, if any, as may properly be considered. It may describe a class of persons who are to take as tenants in common, or who are to take at a definite or fixed time, or it may denote an indefinite succession of lineal descendants, who are to take by inheritance. *Mendenhall v. Mower,* 16 S. C. 303. The word, when standing alone, was formerly held to have *prima facie* the same meaning as " heirs of the body," " lineal descendants, indefinitely," and was construed as a word of limitation, and probably

the weight of authority is still that way.   Chancellor Kent says, " It may be used either as a word of purchase or limitation, but it is generally used by the testator as synonymous with ' child ' or ' children.' "   4 Commentaries, 278.   And Judge Redfield, in his work on Wills (volume 2, p. 363), takes the same view, and favors breaking away from the English law, " redeeming it from a perversion under which it has long labored, and which has already produced infinite injustice."   This appeal does not seem to have·been very productive in the way of results, though in England, as well as in this country, there is a strong tendency against the broad construction approved in earlier cases, and slight indications are seized upon as manifesting an intention on the part of the testator to limit the meaning of the term. · See *Pearce v. Rickard,* 18 R. I. 142 (26 Atl. 38, 19 L. R. A. 472, 49 Am. St. Rep. 755); *Wistar v. Scott,* 105 Pa. 200 (51 Am. Rep. 197); *Jackson v. Jackson,* 153 Mass. 374 (26 N. E. 1112, 11 L. R. A. 305, 25 Am. St. Rep. 643); *Soper v. Brown,* 136 N. Y. 244 (32 N. E. 768, 32 Am. St. Rep. 73); *Thomas v. Levering,* 73 Md. 451 (21 Atl. 367).   Thus, in *Wistar v. Scott, supra,* the court said:  " The word ' issue,' in a will, *prima facie* means the same as ' heirs of the body,' ' lineal descendants, indefinitely,' and is to be construed as a word of limitation; but the *prima facie* construction gives way if there is anything on the face of the will to show that the word was intended to have a less extended meaning, and to be applied to children only, or, as in this case, to lineal descendants of a particular class, in being at a specified time."   To the same effect, see *Palmer v. Horn,* 84 N. Y. 516.   And so, where the issue is to take the share of a deceased parent, the word is construed to mean the children of such parent.   *Cochrane v. Schnell,* 140 N. Y. 516 (35 N. E. 971, 978); *Madison v. Larmon,* 170 Ill. 65 (48 N. E. 924, 62 Am. St. Rep. 411); *King v. Savage,* 121 Mass. 303, 306; *Parkhurst v. Harrower,* 142 Pa. 432 (21 Atl. 826, 24 Am. St. Rep. 507); *Fairfield v. Bushnell,* 32 Beav. 158.

And a gift to a certain person for life, and on her death to her lawful issue, will be construed to mean to her children. *Palmer v. Dunham,* 125 N. Y. 68 (25 N. E. 1081); *Shalters v. Ladd,* 141 Pa. 349 (21 Atl. 393, 397).

Turning now to the different clauses of the will, it will be found that the deceased testator employed the word in a limited sense, as synonymous with children. Thus in the first of the paragraphs quoted, " lawful issue of any who may die " is later referred to, in " the child or children so surviving shall take the share of the income which the father or mother would have taken." In the second paragraph quoted this meaning is emphasized, for express provision is made: " If any one child or any children of my said children, shall have died before the termination of the trust the share which would have gone to any of them is cast upon their children or remote descendants lawfully begotten." It is manifest that the word " issue " was used in the portions of the will quoted as synonymous with " children," and the language employed must be construed the same as though he had directed his bounty to be paid to the lawful children of William Frederick in being at the time of his death.

IV. The decisions are unanimous that, in the absence of statutory provisions modifying the common law with respect to illegitimate children, the words " issue," " child,"

4. BASTARDS: effect of recognition; "lawful issue." or " children," found in a will or statute, whether qualified by the word " lawful " or not, are to be construed as only those who are legitimate, and, if others are intended, this must be deduced from the language employed, without resort to extrinsic facts. *Collins v. Hoxie,* 9 Paige, Ch. 81; *Flora v. Anderson* (C. C.) 67 Fed. 182; *Gates v. Seibert,* 157 Mo. 254 (57 S. W. 1065, 80 Am. St. Rep. 625); *McDonald v. Ry.,* 144 Ind. 459 (43 N. E. 447, 32 L. R. A. 309, 55 Am. St. Rep. 185); *Heater v. Van Auken,* 14 N. J. Eq. 159. This is on the ground that at the common law a bastard child had no

inheritable blood, was kin to no one, could have no ancestor, nor be an heir, and could have no heirs save those of his own body.   But this rule has been greatly modified by the enactment of statutes ameliorating his condition, and in different degrees conferring the rights of legitimate children. The bastard was *nullius filius* mainly in the matter of inheritance.   In many other respects his status was the same as others.   He could not marry within the levitical degrees, and was held to be within the act requiring the consent thereto of parent or guardian.   His settlement was that of his mother.   *King v. Inhabitants of Hoduel,* 1 Term R. 98.   The statutes of this State do not purport to legitimate the offspring of parents born out of wedlock.   Section 3384 of the Code provides that " illegitimate children inherit from their mother and she from them "; and section 3385, that " they shall inherit from the father when the paternity is proven during his life, or they have been recognized by him as his children; but such recognition must have been general and notorious or else in writing.   Under such circumstances, if the recognition has been mutual, the father may inherit from his illegitimate children."   These sections have been liberally construed, and in several decisions a natural child, when duly recognized by the father, held, in the matter of inheritance, as said in *State v. Hastings,* 74 Iowa, 574, to " stand in the same relation to him as though born in lawful wedlock."   *Milburn v. Milburn,* 60 Iowa, 411;  *McGuire v. Brown,* 41 Iowa, 650;  *Johnson v. Bodine,* 108 Iowa, 594; *Alston v. Alston,* 114 Iowa, 29;  *Goulding v. Phillips,* 124 Iowa, 496.

But these are statutes of descent only, and do not undertake to change the status of the bastard.   *Van Horn v. Van Horn,* 107 Iowa, 247.   He is illegitimate after recognition, precisely as before, and inherits as such, and not because he has become legitimate.   No duty is created on the part of the putative father for his support, nor the right to his custody or service during minority.   See *Lawson v. Scott,* 1

Yerg. (Tenn.) 92. Even an agreement for his support, executed by the father, has been declared to rest on a moral obligation only, and not to be enforceable (*Nine v. Starr*, 8 Or. 49), though such a consideration was deemed sufficient in the early English cases (see *Hargroves v. Freeman*, 12 Ga. 342). According to the case last cited, as well as *Smith v. Rooke*, 6 C. B. N. S. 223, the consideration for an obligation of the father, executed to the mother, providing for the payment of certain sums for the care and maintenance of such a child, must be found in legislative enactments casting the burden of support on the father. Even then it has been held necessary to show a threat to resort to such statutes. *Mercer v. Mercer*, 87 Ky. 30 (7 S. W. 401). There is nothing in the law of this State creating the liability of the father, even after statutory recognition, for necessaries furnished an illegitimate child. To compel his support, resort must be had to proceedings in the name of the State, under chapter 50, title 25, of the Code, and then the judgment is based on the child's illegitimacy. So that the rights of, and duties owing to, the illegitimate, even after statutory recognition, differ radically from those of a child born in wedlock. Only by the subsequent marriage of the parents can an illegitimate child ever become legitimate in this State. Section 3150, Code. When this happens, he is just as legitimate, before the law, as though actually born in wedlock. *Gates v. Seibert*, 157 Mo. 254 (57 S. W. 1065, 80 Am. St. Rep. 624); *Carroll v. Carroll*, 20 Tex. 731; *Sheigh v. Strider*, 5 Call (Va.) 439. This has also been held when the child is legitimated by the decree of court under an act of the Legislature, or, because of some act of the putative father, the child is made by the statute legitimate. *McKamie v. Baskerville*, 86 Tenn. 459 (7 S. W. 194); *Blythe v. Ayers*, 96 Cal. 532 (31 Pac. 915, 19 L. R. A. 40). And under a statute providing that, where the testator omits to provide for any of his children in his will, the one so omitted shall share his estate as though he had died intestate, the

Supreme Court of California held that as another statute declared that " every illegitimate child, is in all cases, an heir of his mother and inherits her estate, in whole or in part, as the case may be, in, the same manner as if he had been born in lawful wedlock," an illegitimate daughter omitted from her mother's will was included in the word " children," and entitled to take under the first-mentioned statute.    *Estate of Wardell,* 57 Cal. 484.    That is, when placed in the state and condition of heir, and invested with the character and capacity of heir, all the rights, privileges, and legal consequences incident to that relation were tacitly conferred on her.    *Swanson v. Swanson,* 2 Swan. 446.    See, also, *Marshall v. Ry.,* 120 Mo. Sup. 275 (25 S. W. 179).    *Miller's Appeal,* 52 Pa. 113, much relied on by appellees, was based on the thought that the bastard had been fully legitimated. There the testator in 1811 devised certain property to his wife for life, with remainder to his daughter Esther, and directed that upon the decease of the latter it be disposed of, and the proceeds be equally divided " between the lawful issue of my said daughter Esther."    She had a natural child, named Rachel, who married one Grillortzer; and in 1854 the General Assembly passed an act providing that she " shall have and enjoy all the rights and privileges of a child born in lawful wedlock and shall be able and capable in law to inherit and transmit any estate whatever as fully and completely and to all intents and purposes as if she had been born in lawful wedlock."    She died shortly afterwards, and left five children.    Esther died in 1865.    The property was sold, and the contest was between the above children and the heirs of the testator, who contended that Esther did not leave lawful issue.    In deciding that Rachel's children were included in this term, the court, in the course of the opinion, said:

It is evident that, if Rachel had survived her mother, she would have been lawful issue, within the meaning of the will, because, though not so by nature, she was made so by

the supreme legislative power of the State. If the Legislature can remove the taint of blood and make it inheritable, they did so in this case. . . . Nor can this be fairly called making of a new will by Act of Assembly forty years after the death of the testator. He must be presumed to have meant his words should have their appropriate legal effect, and it is the province of the lawmaking power to define what shall be lawful issue. . . . The testator referred himself to the law for ascertainment of lawful issue.

See, also, *McGunigle v. McKee,* 77 Pa. 81 (18 Am. Rep. 428). The power of the Legislature to effect the devolution of property by giving to words a meaning different than had when made use of by a testator may well be doubted, as this would seem to substitute an intention other than that entertained by the testator, and allow the will to speak as of the date of the enactment of the Legislature, rather than as of that of his death.

On the other point the decision is based on the construction of the act of the Legislature legitimating Rachel as fully as though born in "lawful wedlock," and, under all the authorities, if this happened, there was no interruption of the line of descent. Here is the very difficulty with appellees' case. It lacks the element essential to constitute the children of William Frederick "lawful issue," namely, legitimization. They may inherit if duly recognized, but not as legitimate children. This distinction was pointed out in *Hicks v. Smith,* 94 Ga. 809 (22 S. E. 153). There the testator, who died in 1853, devised certain property to his daughter for life, and then to her children. She left two sons, one of whom died in 1887, leaving a widow and daughter, and the other in 1894, without getting married. The latter left an illegitimate son, who was legitimated by order of court in 1892; and the point of issue was whether the natural son came within the testator's designation of "child or children living at the time of her death." It would seem that the decision might very well have been put upon the ground that these words were made use of by the testator

in the sense usually understood at the time the will was executed, as was held in construing a similar will in *U. S. Trust Co. v. Maxwell*, 26 Misc. Rep. 276 (57 N. Y. Supp. 53). But it was based on a statute enacted long afterwards, under which the natural son was legitimated by the superior court, in the words of such statute, declaring "said child to be legitimate and capable of inheriting from the father in the same manner as if born in lawful wedlock." The words following "legitimate" were held to be of limitation, and to obviate the conclusion that he was entitled to take as a "child" under the will of his grandfather. The decision seems to have been somewhat influenced by the rule that statutes in derogation of the common law are to be strictly construed, but, in any event, indicates the necessity of complete legitimation to warrant the inclusion of the bastard in the words "issue," "child," or "children," as employed in wills or deeds or statutes.

In *Lyon v. Lyon*, 88 Me. 395 (34 Atl. 180), the bequest was to a class designated as "my nephews and nieces who shall be living at the time of my decease." The question involved was whether an illegitimate child of a brother who afterwards married the mother would come within that class. In that State, as in this, the natural child inherits as an illegitimate, and for this reason was held not to be included. In *Physick's Estate*, 2 Brewst. (Pa.) 179, the natural son was made legitimate by an act of the Legislature, and yet the court declared the only object was to "give to the bastard inheritable capacity as to the estates of his supposed parents, and that, as by the general law he could not take as lineal heir, the property devised to him was subject to the collateral inheritance tax." In *Thompson v. McDonald*, 22 N. C. 463, 480, the act of the Legislature permitted, where a woman died intestate and without legitimate children, "those commonly called illegitimate or natural children" to succeed to her property. As such offspring were neither declared the children of the mother, nor author-

ized to inherit generally, the court held that a natural child did not come within a devise to children. In *Black v. Cartnell*, 10 B. Mon. (Ky.) 188, the testator, in effect, devised property to his daughter Catherine, and provided that, if she died without lawful issue of her body, it should go to his heirs. Catherine left an illegitimate son, and the court held that, though a lawful heir of her body, he was not lawful issue of her body, as the latter was interpreted to mean the descendants of the person, and that the fact that the illegitimate child may inherit from the mother seemed " hardly sufficient ground for saying that he is embraced in the words ' lawful issue,' as he certainly would not be in the words ' lawful descendants.' " See *Van Derlyn v. Mack* (Mich.), 100 N. W. 278, 66 L. R. A. 437. It is apparent from these decisions that the word " issue " has a well-settled meaning in law, and that it does not include illegitimate offspring, unless a different intention appears from the context. In the will before us the testator emphasized this thought by prefixing the adjective " lawful," and this, in view of his knowledge of his son's course of life, is significant. Had he cared to provide for the offspring of this meretricious relation, he certainly would not have made use of language ordinarily understood to exclude them from sharing his bounty. We have discovered no authority reaching a different conclusion, and are content with saying that the written recognition of Francis Tadmir Parker, while conferring upon him the right of inheritance, did not remove the taint of illegitimacy, and, as he is not the " lawful issue " of William Frederick, he is not entitled to take the income under the will of the testator.

V. It is not necessary to do more at this time than determine to whom the income of the estate should be paid. This seems to be all that is essential to the administration of the testator's estate. Mere future contingencies, which may never arise, or problematical states of fact, will not be given consideration. The province of courts is to declare

rights only with a view of granting immediate relief, and, aside from directing that the consent of the guardians of ·these children by the trustees need not be obtained before selling property, we express no opinion as to who will be ·entitled to the estate upon the death of plaintiff.   *Wahl v. Brewer*, 80 Md. 237 (30 Atl. 654); *Austin v. Bailey*, 163 Mass. 270 (39 N. E. 1022); *Heald v. Heald*, 56 Md. 300.

The decree of the district court was erroneous, and is *reversed*.