(26 Misc. Rep. 276.)

### UNITED STATES TRUST CO. v. MAXWELL et al.

(Supreme Court, Special Term, New York County. February, 1899.)

1. MARRIAGE—EVIDENCE—COHABITATION AND REPUTATION.

   Where intercourse between man and woman was meretricious in its inception, a marriage will not be presumed from cohabitation and reputation. There must be convincing proof of an actual subsequent marriage.

2. WILLS—CONSTRUCTION—ILLEGITIMATE CHILDREN—STATUTES.

   Testator, knowing that his son was the father of an illegitimate child, gave property in trust for the son, to be paid over, on the son's death, to "his lawful issue," and, in default of such issue, one half of the fund was to be paid to his son's appointee, and the other half to certain others. Held, that the illegitimate child did not take thereunder by reason of the subsequently enacted domestic relations law (Laws 1896, c. 272, § 18), providing that an illegitimate child whose parents have intermarried has all the rights of legitimate offspring.

Action by the United States Trust Company, trustee under the will of James G. Moffet, deceased, against Mary A. Maxwell and others. Order for judgment.

Edward. W. Sheldon, for plaintiff.
Jacob Fromme, for defendant Moffet.

STOVER, J. This action is brought by the trust company, trustee under the last will and testament of James G. Moffet, deceased, for an accounting, and for directions as to the application of a trust fund, the interest of which was paid to James Moffet, now de-

ceased, during his lifetime. The questions to be considered arise under the eighth paragraph of the will of James G. Moffet, which is as follows:

"Eighthly. I give and bequeath unto the United States Trust Company of New York the remaining one equal third part of my residuary estate, or of the proceeds of sale thereof, to be paid or transferred to it in the manner hereinafter provided, and to be held by it, as trustee, upon the following trusts; that is to say: To invest so much thereof as shall be paid to it in money in the public debt of the United States of America, or of any of the states thereof, or of any city in the United States of America, or of any county in the states of New York or New Jersey, or in the mortgage bonds of any railroad corporation in the United States of America or Canada, or in bond and mortgage on improved and unincumbered real property in the states of New York or New Jersey, and to retain so much thereof as shall be transferred to it in securities in such securities, with power to sell such securities, or any of them, with the consent of the beneficiary for life, reinvesting the proceeds of such securities, when sold or paid off, in the securities hereinabove enumerated, and keep the trust fund so invested; and to receive the interest and income thereof, and pay over such interest and income, in quarter-yearly payments, unto my said son, James Moffet, during his natural life, and on his death to assign, transfer, and pay over the capital unto his lawful issue then living; and, in default of such issue, then, on his death, to assign, transfer, and pay over one-half of such capital unto such person or persons, and in such estates and proportions, as my said son shall, by his last will and testament, executed in due form of law to pass real property, direct and appoint, and the remaining half of such capital, or the whole thereof, in default of such appointment, unto my children then living, and unto the lawful issues then living of my children then dead, the issue of a deceased child taking by representation the share only which its parent, if living, would have taken, absolutely forever."

The defendant James Moffet claims under this clause as the issue of James Moffet, deceased, being the son of James Moffet and Ellen Arbuthnot, and born August 9, 1874, at Rutherford, N. J. There was a ceremonial marriage of James Moffet to Ellen Arbuthnot celebrated August 31, 1885. The defendant James Moffet at this time was upward of 11 years of age. It is claimed in his behalf that what is popularly called a "common-law marriage" was celebrated at Rutherford some time during December, 1873. The only direct evidence of the marriage was given by Ellen Arbuthnot Moffet, the mother of the defendant James Moffet. It seems from the evidence of the mother of the defendant Moffet that she made the acquaintance of James Moffet some time in 1870, and that at that time she met him in New York, going to the theaters with him, and spending the nights with him in the hotels and various places in New York City. It is unquestionable from the evidence that the intercourse from that time on until 1874 was meretricious. Ellen Arbuthnot continued to reside in New York for some little time, when there was a quarrel, and for a period of about two years their relations were interrupted, but were again resumed in 1873, she having met him upon the streets in New York, and he going with her to a house in Twenty-Eighth street, of which she was an inmate, where their relations were resumed. Ellen Arbuthnot had made her home with her sister, Mrs. Duane, at South Rutherford, and some time during the summer of 1873 Ellen Arbuthnot and James G. Moffet went to reside in Rutherford, and continued there for some time. It is during this

period that it is sought to establish the nonceremonial marriage; the testimony of Ellen Arbuthnot being that on the 31st of December, 1873, when, as she says, she discovered that she was pregnant, James Moffet at that time presented her with a ring, and said that they were husband and wife. It is not my purpose to review in detail the testimony, but I call attention to some of the more important phases of it, simply to direct attention to what I consider the controlling facts. As is stated, there is no direct corroboration of the story of Ellen Arbuthnot, but it is sought to confirm it by the general reputation in the neighborhood, and for this purpose the people who resided at that time in South Rutherford have been introduced as witnesses, and have testified to the circumstances under which James G. Moffet and Ellen Arbuthnot were understood to have been residing and cohabiting in South Rutherford. But it will be discovered that all of the information in that regard is derived either from Mr. Duane, Mrs. Duane, Ellen Arbuthnot, or some members of the family. Yet Mr. Duane, when upon the stand, testified that as early as July, 1873, his wife had told him that they were married, and that subsequently it was admitted by Moffet that this was false. The language on the part of Moffet, when, in December, Duane said, "I thought you were married before," was: "Well, we were not. Eliza [being the wife of Duane] knew all about it, and she did not want to have you know there was anything different." So that if, in June or July, when it is conceded that there had been no marriage, Duane, James Moffet, Ellen Arbuthnot, and other parties were stating to the public that Ellen Arbuthnot and James Moffet were married, but little weight is to be given statements based upon declarations of that character. But I think it must be said that the statements made by the Duane family, and even by Moffet and Ellen themselves, were understood by them not to be true, but were made simply for the purpose of covering up the illicit relations existing. There is no doubt but what the intercourse between Ellen and James was, in its inception, meretricious, and, as has been repeatedly said, this fact having been once established, the authorities agree that its continuance must be presumed until proof of a change and of a marriage, and that in such case marriage will not be presumed from cohabitation and reputation, but proof of an actual subsequent marriage is necessary; and, while this may be shown by circumstances, they must be convincing, and such as would satisfy the judgment, and in this case I find no such circumstances. And, in addition to this, on August 31, 1885, when the ceremonial marriage took place, Mrs. Moffet declared herself to be an unmarried female, and was married under her maiden name, declaring that it was her first marriage. I think it must fairly be said that up to August, 1885, there had been no marriage between Ellen Arbuthnot and James Moffet.

The next question arises upon the construction to be given to this clause of the will, in view of section 18 of the domestic relations law (Laws 1896, c. 272), which is as follows:

"An illegitimate child whose parents have heretofore intermarried, or shall hereafter intermarry, shall thereby become legitimatized and shall be consid-

ered legitimate for all purposes, entitled to all the rights and privileges of a legitimate child; but an estate or interest vested before the marriage of the parents of such child shall not be divested or affected by reason of such child being legitimatized."

And it is claimed that the words "lawful issue," as used by James G. Moffet in his will, include an illegitimate child which has been legitimatized under this act. There can be no doubt but that James G. Moffet knew of the relations between Ellen Arbuthnot and his son James, and that he knew of the marriage of August 31, 1885, and the birth of the defendant James Moffet, in 1874, for upon the 20th day of March, 1886, he had received a letter from Ellen Moffet, in which she stated that James Moffet was her husband, and used this language: "I will convince you that he is my legal husband, and when and where we were married by a minister, if you will only grant me a meeting with you at my house," etc. It appears from the evidence that he was aware of a suit which had been brought by Mrs. Moffet against her husband, charging him with abandonment, and which suit was commenced upon the same day that this letter was written. The will under consideration was made four days after the receipt of this letter and the commencement of that suit, to wit, on March 24, 1886, and by that will the share of the son, James Moffet, was placed in trust, so that during the lifetime of James Moffet he could only receive the income, and, on his death, the trustee was directed to pay over the capital unto the lawful issue of James Moffet, and, in default of such issue on his death, to assign and pay one half unto such person or persons as he might appoint, and the other half unto the children of the testator then living, and the lawful issue of such children as might then be dead. At that time the words "lawful issue" had a clear, distinct, and well-settled meaning, and meant issue born in wedlock. At that time, illegitimate children, or those born out of wedlock, were incapable of taking. So that when James G. Moffet used the words "lawful issue" he must have intended the lawfully begotten children of James Moffet, as then understood. In considering this clause we are not to look alone at the legal construction of the domestic relations act, but we are to discover and carry out, if possible, the intention of the testator. And while it is true that the act of 1896 is to be construed for the purposes of carrying out the intention of the legislature, namely, the legitimation of children whose parents have subsequently married, and such construction is to be given to it whenever its legal effect is called into operation, yet, in considering a will, we are to arrive at the intention of the testator, and we are not to give construction to language used by him that was never intended or understood by him. We are to assume that he used the words with knowledge of the law as it then existed, and we are not to assume that he had in contemplation that the legislature would change the entire effect and meaning of the words used by him. When he used the words "lawful issue," he used them as they were then understood both by laymen and as the law had interpreted them, namely, children begotten in lawful wedlock. What he might have done if a different construction could have been placed upon

those words, we are not at liberty to speculate. I think it must be determined that it was the intention of the testator that he who was then the illegitimate son of James Moffet should not share in the estate, and that the words "lawful issue" were used by James G. Moffet with the intention of preventing the property going from him to the defendant Moffet. The fact that he has inserted in his will a power to James Moffet to dispose of one-half of the principal sum as he may see fit does not militate against this construction, but it rather shows, to my mind, that it was the desire of the testator that some provision might, in the exercise of discretion on the part of James Moffet, be made; or, perhaps, anticipating, either through the marriage or other events which might happen, that James Moffet might, in the years to come, have lawful issue which might be deemed proper recipients of the bounty of the testator, he provided that one-half of the principal sum, the income of which was to be devoted to James Moffet during his life, might be disposed of by James Moffet. But, whatever might have operated upon the testator's mind,—and it is easy to see a variety of circumstances which might have induced this act,—I think he intended that the illegitimate child should not profit from his estate, unless under the power given to James Moffet, and that he intended that his estate should not be taken from his own children, and those who were proper objects of his bounty, and distributed to the illegitimate offspring of a son for whom he was compelled to make provision by a trust clause in his will.

Some contention is made that the reservation of the statute as to vested estates or interests covers the case under consideration. While it is not necessary, with the views that I have, to decide this contention, yet I think it cannot be said that the interest or estate here vested before the death of James Moffet. And I am not unmindful of a decision where, under the particular wording of a will, it was held that an interest had vested; but I think that to hold in this case that there was a vested interest in the heirs of James G. Moffet would be giving a construction to the word "vested" which has not heretofore been understood to attach to it. The interest of the heirs of James G. Moffet was contingent, and neither the persons nor the estate could be determined until the death of James Moffet. It may be quite likely that the legislature intended that no interest, whether vested or contingent, should be affected, and the use of the word "interest" in connection with the word "estate" would seem to give some color to this idea; yet the term "vested estate" has such a definite and well-defined meaning that to construe the interest of the heirs under this will to be a vested one would, it seems to me, destroy the force or value of the word, and render it of as little value in determining legal propositions as many other popular expressions have when inserted in the statutes. There may be a decision and decree in accordance with this memorandum.

Ordered accordingly.