MIRIAM ANONYMOUS, Petitioner, *v.* JOHN ANONYMOUS, Respondent.
MICHAEL ANONYMOUS, Petitioner, by MIRIAM ANONYMOUS, Mother, Petitioner, *v.* ROBERT ANONYMOUS and LUCY ANONYMOUS, Respondents.

Domestic Relations Court of New York, Family Court, Kings County, August 9, 1940.

*William Samuels*, for the petitioners.

*Blake, Stim & Curran* [*Menaham Stim* of counsel], for the respondents.

SICHER, J. These are two companion proceedings. It has been stipulated that they be tried together and that all evidence be deemed to have been taken simultaneously in each of them.

Under one petition (Docket No. 744 — 1940) petitioner Miriam C. (formerly Miriam R.) seeks support from respondent John C. both for herself as his alleged wife and also for her infant son Michael as the alleged child of that respondent.

Under the other petition (Docket Nos. 835–836 — 1940) she seeks in that child's behalf support also from respondents Robert C. and L. C. (the parents of respondent John C.) as its alleged grandparents. In the latter petition the respondent L. C. was originally misdescribed as " Elsie C." but at the June 7, 1940, hearing that petition was, on consent, amended to state her correct name.

After study of the oral and documentary evidence and of the full and able briefs, supplemented by personal research, I am constrained to reach a decision which makes superfluous much of the testimony provisionally taken.

Both Miriam and John admit a single act of sex intimacy with each other on April 5, 1939. It is also not disputed that Miriam was delivered of the child Michael on January 5, 1940. Miriam

asserts, but John and his parents deny, that Michael is the fruit of that April 5, 1939, episode.

If John and Miriam were in law husband and wife on January 5, 1940, it would be within the power, and indeed the established duty, of this court to determine whether or not Michael is the child of respondent John and, consequently, the grandchild of respondents Robert and L. C. (*Baxter* v. *Baxter*, 250 App. Div. 502.) And if I had decided that Miriam and John were legally married and also that John is the father of Miriam's child Michael, I could, and would, proceed to admeasure the amount of support owing from John as husband and father (Dom. Rel. Ct. Act, § 92, subd. 1, and § 101, subd. 1) and from Robert and L. C. as grand-parents. (Dom. Rel. Ct. Act, § 101, subd. 3.) On the other hand, if I find, as I reluctantly must, that Miriam is not, and never was, the legal wife of John, this court lacks jurisdiction to enter a support order against any of the respondents.

As to respondent John: Filiation proceedings in the city of New York against the putative father of a child born out of wedlock lie within the exclusive jurisdiction of the Court of Special Sessions of the City of New York. (Inferior Crim. Cts. Act, § 60.)

As to respondents Robert and L. C.: The statutory duty of support imposed upon grandparents, under subdivisions 3 and 4 of section 101 of the Domestic Relations Court Act, is not, in my opinion, enforcible in this court against the parents of a putative father of a child born out of wedlock. Section 62 of article V of the Inferior Criminal Courts Act of the City of New York provides that " the parents of a natural child are liable for its support," but that, " in case of the neglect or inability of the parents to provide for the support of the child, it shall be supported by the City of New York." Similarly, article VIII of the Domestic Relations Law, entitled " Support and education of child born out of wedlock, and proceedings to establish paternity," contains substantially identical provisions of statewide application. (Dom. Rel. Law, § 120, subd. 1, and § 132.)

But, although expressly directing community support of the child in case of the neglect or inability of its parents, neither the Inferior Criminal Courts Act of the City of New York nor the Domestic Relations Law contains any provision analogous to sub-division 3 of section 101 of the Domestic Relations Court Act for the secondary liability of grandparents. Moreover, the support obligation even of the father of a child born out of wedlock does not exist at common law and arises solely by virtue of statute. (*People ex rel. Lawton* v. *Snell*, 216 N. Y. 527.) Likewise, although the Decedent Estate Law confers upon a child born out of wedlock,

and its legitimate descendants, certain rights of inheritance from the mother (Dec. Est. Law, § 83, subd. 13), and also upon the mother certain rights of inheritance from such child and its legitimate descendants (Dec. Est. Law, § 83, subd. 7), there have been created no such rights either from or in favor of the putative father.

Generally speaking, except in specific respects provided by statute, a child born out of wedlock is still *nullius filius*. (*Matter of Cady*, 257 App. Div. 129; affd., 281 N. Y. 688.)

Accordingly, inasmuch as " the intent and purpose of the legislative commands must be found from the statutes relating to the same general subject-matter taken as a whole " (*Betz* v. *Horr* 276 N. Y. 83, 88; citing *Seligman* v. *Friedlander*, 199 id. 373), the inference of law necessarily follows that the term " grandparents " in subdivisions 3 and 4 of section 101 of the Domestic Relations Court Act is not intended to include the parents of a putative father of a child born out of wedlock. (Cf. Op. Atty.-Gen., [1934] 51 St. Dept. Rep. 259, to the effect that the analogous provisions of section 125 of the Public Welfare Law changed the common-law liability for support and should be strictly construed.)

The evidence on the question of paternity seems to me to point persuasively against respondent John, and the circumstances tug strongly on one's sympathy for the plight of the mother and child, who are admittedly without means and likely to become public charges unless respondents either are placed under support orders or voluntarily assume financial responsibility. But this statutory court of limited jurisdiction must keep within the scope of its powers and bow to the compelling authority of appellate court decisions.

It remains only to state the further reasons for my conclusion that both petitions must be dismissed as matter of law.

Concededly, Miriam and John were the principals in a formal marriage ceremony at Manassas, Va., on October 19, 1939. Such ceremonial marriage is presumed to be valid, and any party attacking it has a heavy burden of proof. (*Matter of Callahan*, 262 N. Y. 524; *Matter of Salvin*, 106 Misc. 111, 112. Cf. *Matter of Biersack*, 96 id. 161; affd., 179 App. Div. 916, and *Matter of Masocco* v. *Schaaf*, 234 id. 181.)

However, " the principle of the presumption in favor of the validity of a ceremonial marriage, urged by respondent, cannot be invoked against an adequate factual demonstration to the contrary." (*Matter of Shuff*, 151 Misc. 754; *Anonymous* v. *Anonymous*, 174 id. 496.)

It is, therefore, pertinent to explore all the facts surrounding such October 19, 1939, ceremony at Manassas, Va.

The onset of Miriam's pregnancy at once started an exchange of frantic letters and talks. John's motivation is not clear — whether fear of prosecution, desperate desire to keep from his parents knowledge of the trouble, or sincere concern for the child — but there is no uncertainty or dispute concerning the essential facts of the ensuing program of action. The negotiations eventuated in an oral agreement that John and Miriam should go through a marriage ceremony, upon the understanding, however, that they were not to cohabit and that such nominal marriage would be promptly dissolved.

But apart from doubt as to the validity of such a pretended, unconsummated marriage (cf. *Popielawski* v. *Gimbel*, 235 App. Div. 198; affd., 260 N. Y. 514), it would unquestionably be void if at the time of the performance of the ceremony John lacked the legal capacity to marry. And it was a fact known to Miriam in August, 1939 — (if indeed not already on April 5, 1939) — that John was not single. Ever since November 17, 1931, he had been the husband of Dawn (W.) C., although for some little while they had been separated. During 1939 she had been living in a tuberculosis sanitarium in Bernalillo county, N. M., and he, similarly afflicted, had been sojourning in California and New York. So, to clear the way for the promised marriage with Miriam, John must first procure the divorce from Dawn C. which he had long contemplated but had been unable to finance. It was, therefore, arranged that Miriam would furnish the money for John's establishing a residence at Reno and procuring a Nevada decree of divorce from Dawn C. But the cost was found to be prohibitive; the limited fund which Miriam could raise sufficed only for the cheaper " mail order " " Judgment of Divorce " which John caused to be entered on September 30, 1939, against Dawn C. in the Court of First Instance of Huamantla, Judicial District of Juarez, State of Tlaxcala, Mexican Republic. Armed with an exemplified copy of that document, on October 19, 1939, Miriam and John journeyed together from New York city to Manassas, Va., went through a marriage ceremony there before a duly qualified local official, procured from him a " Certificate of Marriage " " under authority of a license issued by  *  *  *  Clerk of the Circuit Court of Prince William County, State of Virginia," immediately returned to New York city, parted at the railroad station there, and did not see each other again until the June 7, 1940, hearing in this court.

Neither John nor Dawn C. at any time ever resided or was physically present any where in the Republic of Mexico; the aforementioned " Judgment of Divorce " was procured wholly through the mails.

That such type of Mexican divorce is a nullity and without any legal force within New York is the firmly established rule in this State. (*Baumann* v. *Baumann,* 250 N. Y. 382; *Vose* v. *Vose,* 280 id. 779; *Matter of Alzmann* v. *Maher,* 231 App. Div. 139; *Risk* v. *Risk,* 169 Misc. 287; *Coakley* v. *Coakley,* 161 id. 867.) And inasmuch as it is also well settled in New York that any subsequent attempted marriage, by a person at a time when his spouse is living, is void (Dom. Rel. Law, § 6, subd. 1; *Matter of Burdak,* 173 Misc. 839, 841 and cases cited), the October 19, 1939, marriage ceremony was ineffectual to constitute Miriam the wife of John and thereby legitimatize the child then in her womb (cf. *Matter of Lentz,* 247 App. Div. 31), unless that unwelcome conclusion of law can be averted by the particular additional facts hereinafter discussed.

*First,* it is suggested that the New York law is inapplicable because (1) the matrimonial domicile of John and Dawn is not shown to have been the State of New York and the above-cited authorities condemning Mexican " mail order " divorces deal only with parties who had been residents of that State, and (2) as the October 19, 1939, marriage ceremony was performed in Virginia, its validity is governed by the law of Virginia.

True, the question whether a marriage is void *ab initio* is ordinarily determined by the law of the State where it was celebrated. (See *Van Voorhis* v. *Brintnall,* 86 N. Y. 18, 24–27, and *Van Wyk* v. *Realty Traders, Inc.,* 215 App. Div. 254, 256.) However, *lex fori* controls if *lex loci contractus* is deemed repugnant to the public policy of the State where the matrimonial status is under judicial examination. (Cf. *Cunningham* v. *Cunningham,* 206 N. Y. 341.) Thus, in *Baumann* v. *Baumann* (*supra*) the New York Court of Appeals did not hesitate to adjudicate a Mexican divorce void notwithstanding that one of the parties thereto had gone with his prospective bride to Connecticut for the second marriage ceremony; likewise, in *Risk* v. *Risk* (*supra*) and *Coakley* v. *Coakley* (*supra*) the Mexican divorce decree was treated as a nullity despite the fact that the second marriage had in the one instance been performed in Connecticut and in the other instance in Maryland.

In the case at bar, too, Virginia was briefly visited solely because a marriage license could not be procured in New York; and in that connection there may be materiality in John's admission that he had last voted in New York and regarded that State as still his domicile.

Moreover, there is operative the further principle that in a proceeding before a New York court the applicable common law of another State is deemed to correspond with that of the State of New York (*Southworth* v. *Morgan,* 205 N. Y. 293, 296; *Mencher* v.

*Goldstein*, 240 App. Div. 290, 291; *Matter of Chinsky*, 159 Misc. 591, 593); and the statute law of another State must be proved as a fact. (*Gavin* v. *Malherbe*, 146 Misc. 51; affd., 240 App. Div. 779; affd., 264 N. Y. 403.)

Petitioner's poverty precluded her following the approved method of adducing expert testimony on the law of Virginia (see editorial, N. Y. L. J. June 13, 1940, p. 2678); but it would be futile to assign to the corporation counsel of the city of New York the burden of supplying that defect. Although, strictly, judicial notice may not be taken of the law of another State, the unlikelihood that verbal expert testimony would avail is indicated by the fact that petitioner's counsel was unable to refer to any Virginia statute or decision indicating that Virginia takes a different view from New York concerning Mexican " mail order " divorces and personal research also has turned up nothing tending to show that the October 19, 1939, ceremony would be upheld if contested in a Virginia court. On the contrary, I find several decisions in other jurisdictions denying extraterritorial effect to a Mexican divorce decree and adjudging it a nullity. (*Wells* v. *Wells*, 230 Ala. 430; 161 So. 794; *Bethune* v. *Bethune*, 192 Ark. 811; 94 S. W. [2d] 1043; *Ryder* v. *Ryder*, 2 Cal. App. [2d] 426; 37 P. [2d] 1069; *Kegley* v. *Kegley*, 16 Cal. App. [2d] 216; 60 P. [2d] 482; *Bonner* v. *Reandrew*, 203 Iowa, 1355; 214 N. W. 536; *Bergeron* v. *Bergeron*, 287 Mass. 524; 192 N. E. 86; *Newton* v. *Newton*, 13 N. J. Misc. 613; *Commonwealth* v. *MacMaster*, 88 Penn. Super. Ct. 37; *Commonwealth* v. *Manzi*, 120 id. 360; 182 A. 795; *Golden* v. *Golden*, 41 N. M. 356; 68 P. [2d] 928.)

Nor has there been presented or found a single decision anywhere in the United States giving recognition to a Mexican decree of divorce.

Moreover, the Restatement of the Conflict of Laws promulgated by American Law Institute at Washington, D. C., on May 11, 1934, contains the following provisions:

§ 111. " A State cannot exercise through its courts jurisdiction to dissolve a marriage when neither spouse is domiciled within the State."

§ 429. " * * * A judgment, decree or other order of a court is valid if, but only if, * * *

" (b) the State in which it is rendered has jurisdiction to act judicially

" (1) with respect to the person or persons affected, or

" (2) with respect to the subject matter thereof."

*Second*, assume, simply for argument, that Dawn C. was a resident of New Mexico on September 30, 1939 (the date of the Mexican

divorce decree) and that the applicable law might, therefore, possibly be that of New Mexico instead of New York. Even that assumption would not avail to validate such September 30, 1939, decree. For the Supreme Court of New Mexico has recently adjudged a Mexican divorce decree void on the ground that neither spouse had acquired a residence or domicile in Mexico and squarely held that there was no estoppel against attack on such decree in a subsequent suit for divorce in New Mexico notwithstanding that there had been consent to the Mexican decree through Mexican attorneys, the opinion stating: "To permit a foreign State or Nation to assume jurisdiction over residents of this State and grant divorce upon request, like a slot machine in which you deposit a fixed sum of money, press a lever, and out comes a divorce decree, is a condition which New Mexico does not yet tolerate." (*Golden* v. *Golden, supra,* p. 369.)

*Third,* the evidence fully meets the requirement that " where the validity of a second marriage is assailed upon the allegation that one of the parties thereto was a party to an earlier marriage, the presumption is in favor of the validity of the second marriage, and its invalidity cannot be found unless the parties holding the burden of establishing it, complete a chain of evidence which will not only demonstrate the fact and the validity of the earlier marriage and its subsistence at the time of the later marriage, but will aggressively exclude every indication or suggestion which might conceivably rescue the second marriage from invalidity." (*Matter of Salvin,* 106 Misc. 111, 112. See, also, *Matter of Biersack,* 96 id. 161; affd., 179 App. Div. 91.)

That is to say, even though the September 30, 1939, Mexican divorce was a nullity, the October 19, 1939, ceremony at Manassas, Va., might be still presumed binding unless respondents had shown that the November 17, 1931, prior marriage of John to Dawn was valid and also that Dawn was still living on October 19, 1939.

However, the November 17, 1931, prior marriage between John and Dawn C. was satisfactorily proved, not only by John's testimony but also by duly authenticated official certificate showing that on November 17, 1931, at Manchester, N. H., John and Dawn were the principals in a duly performed marriage ceremony. True, such certificate recites that it was John's first, and Dawn's second, marriage; but it was further shown that before such November 17, 1931, ceremony Dawn had been duly divorced from her former husband by decree duly entered in Probate Court in Suffolk county, Mass. (of which State both the parties were then residents).

It was also proved that Dawn was still alive on October 19, 1939, for there was introduced in evidence a duly authenticated decree

of absolute divorce which Dawn herself had on January 2, 1940, procured against John from the District Court of Bernalillo county, State of New Mexico, upon John's answer and appearance.

Incidentally, it seems a travesty on justice that since that January 2, 1940, decree is valid and freed both John and Dawn to remarry it does not operate retroactively to validate the October 19, 1939, ceremony. But the law is to the contrary. (*McCullen* v. *McCullen*, 162 App. Div. 599; *Earle* v. *Earle*, 141 id. 611, 614.)

*Fourth*, none of the respondents is estopped from impeaching the aforementioned September 30, 1939, Mexican divorce. Inasmuch as that decree was procured by respondent John and for the avowed purpose of enabling him to marry Miriam and thereby legitimatize the child, it seems illogical and unfair that he should now be heard to challenge its validity. But controlling authority requires that he be allowed to do so. (*Vose* v. *Vose*, 280 N. Y. 779. Cf. *Krause* v. *Krause*, 282 id. 355, 357.)

On March 12, 1940, the New York Court of Appeals did hold that in an action for separation brought by a second wife an affirmative "defense that defendant lacked capacity to marry plaintiff because the court which, upon his petition, purported to accord him a divorce from his first wife, never obtained jurisdiction over his said wife or of the subject matter of the action, was properly stricken out. Defendant may not be heard to assert in this action that the judgment of divorce which he sought and obtained failed of its purpose and thereby did not give to the defendant that freedom to remarry which he appeared to possess by virtue of that judgment." (Official headnote, *Krause* v. *Krause*, *supra*.) But in so applying to a *Nevada* judgment of divorce the principle that " in general, a person who invokes the jurisdiction of a court will not be heard to repudiate the judgment which the court entered upon his seeking and in his favor " (*Krause* v. *Krause*, *supra*, p. 357), the New York Court of Appeals reaffirmed and expressly distinguished *Vose* v. *Vose* (*supra*) as being a case in which " the plaintiff in a prior action was allowed to repudiate the judgment of divorce which he had obtained " because " neither of the parties ever left this State and the judgment which was repudiated was that of a divorce by a Mexican court which had not even the slightest semblance of jurisdiction to act in the premises." (*Krause* v. *Krause*, *supra*, p. 359.)

Although the five to two decision in *Krause* v. *Krause* (*supra*) has been interpreted as indicating that the Court of Appeals " seems to have moved away from the emphasis in the older cases on penalizing defendant's attempt to evade the strict New York rule by seeking a foreign judgment toward a predominant concern with

doing justice to the plaintiff " (49 Yale L. J. 1130, 1132), nevertheless that court still adheres to its ruling in *Vose* v. *Vose* (*supra*) that the principle of estoppel applied in *Krause* v. *Krause* to a Nevada decree does not extend to a Mexican " mail order " divorce. To a layman it may well seem harsh and narrow that such a distinction should control the instant proceedings merely because Miriam and John happened to be unable to raise money enough to carry out their original plan of procuring a Nevada judgment instead of a Mexican document. But as the Court of Appeals has made and enforces that distinction, this lower court, of limited jurisdiction, has no alternative except to follow. Fortunately, it is unnecessary to determine whether, if the aforementioned September 30, 1939, decree had been procured in Nevada, *Krause* v. *Krause* (*supra*) would have been applicable to a support proceeding in this court of limited jurisdiction as well as to a matrimonial action in the Supreme Court of the State of New York. (See *Anonymous* v. *Anonymous*, 174 Misc. 496.)

In any event the doctrine of estoppel cannot operate against respondents Robert and L. C. For, as the October 19, 1939, ceremony was void *ab initio*, an estoppel against asserting such invalidity would at most run against John only and not also against his parents (who were not parties to the Mexican divorce and had no hand in its procurement).

*Fifth*, this court lacks jurisdiction to declare the child Michael legitimate, even for the sole purpose of support. The power to declare legitimate the child of a void or voidable marriage can be exercised only in an action in the Supreme Court of the State of New York to annul such marriage. (*Hiser* v. *Davis*, 234 N. Y. 300, 307; *Matter of Crook*, 140 Misc. 721, 723.)

True, in *Bracy* v. *Bracy* (167 Misc. 253), Justice PANKEN entered a support order against the father of a child born of a ceremonial marriage adjudged to be void because the first husband of the child's mother was still living at the time of the second marriage ceremony; and in that case Justice PANKEN construed subdivision 6 of section 1135 of the Civil Practice Act as automatically constituting the child of an annulable marriage the legitimate offspring of that one of the parents who at the time of such second marriage had been competent to marry. Thus, if respondent John had been single, but Miriam had been the one lacking the legal capacity to marry, *Bracy* v. *Bracy* (*supra*) might serve as a precedent for declaring Michael legitimate and entering a support order in his behalf against John. But inasmuch as the alleged father in the proceedings before me was not competent to marry the child Michael's mother, *Bracy* v. *Bracy* (*supra*) is not in point.

Unless *Baylis* v. *Baylis* (207 N. Y. 446) precludes such relief, Miriam may institute an action for annulment, in the Supreme Court of the State of New York, under section 1135 of the Civil Practice Act, and seek therein an adjudication that Michael is the legitimate child both of herself and of John.

For the foregoing reasons, I am constrained to dismiss both petitions and to refer petitioner to the department of welfare of the city of New York for financial assistance (home relief) and also for appropriate filiation proceedings. And for family case work guidance she is also hereby referred to the Jewish Family Welfare Society.

Moreover, informal talks with counsel and the favorable impression of John's parents as witnesses encourage me to believe that those respondents will make some voluntary provision for the child Michael, not equal, perhaps, to Miriam's expectations, but commensurate with John's parents' comfortable means and other financial burdens, such as the aid which they must give to their ailing son John and which, out of kindness of heart, they also extend to the children of John's former wife Dawn's first marriage. I rely too on their assurance, at the close of the June 7, 1940, hearing, that if John were permitted to leave that evening for California his parents would bring him back to New York city promptly for such future legal steps in the child Michael's behalf as might become appropriate in the light of this decision.

In conclusion, it should be expressly stated that the attorneys appearing for the respective parties in this court began such representation only after other counsel had arranged for the spurious September 30, 1939, Mexican " mail order " divorce and the ineffectual October 19, 1939, marriage ceremony at Manassas, Va. Present counsel had no knowledge of or part in those arrangements, and they are hereby absolved from all imputation of the professional impropriety of a New York lawyer's advising a Mexican divorce in the face of the condemnatory decisions of the New York Court of Appeals and the Appellate Division.

Five copies of this memorandum are being filed with the original; and the clerk of this court is hereby directed to mail or deliver two copies to the attorney for petitioner (one of them for delivery to petitioner by such attorney) and three copies to the attorneys for respondents (one of them for delivery, by such attorneys, to respondent John and another to respondents Robert and L. C.).