In the Matter of the Accounting of the CHEMICAL BANK NEW YORK TRUST COMPANY, as Trustee under a Trust Created by ENA L. VOUGHT, Respondent. EDWARD CHERNEY, as Guardian ad Litem for CRAIG VOUGHT, an Infant, Appellant-Respondent; FREDERICK SIEGMUND, as Guardian ad Litem for GAY VOUGHT and Another, Infants, Respondent-Appellant; HENRY L. UGHETTA, II, as Guardian ad Litem for CHANCE M. VOUGHT, III, an Infant, et al., Respondents.

First Department, December 21, 1967.

*Edward Cherney* of counsel (*Smart, McKay & Cherney*, attorneys), for appellant-respondent.

*Frederick Siegmund*, respondent-appellant in person.

*Henry L. Ughetta*, II, in person, of counsel (*James S. Brown, Jr.*, with him on the brief; *Willkie Farr Gallagher Walton & Fitz Gibbon*, attorneys), for Henry L. Ughetta, II, respondent.

RABIN, J. In this construction proceeding, Special Term was called upon to determine whether the infant Craig Vought is a

member of the class of "lawful issue" of one Chance M. Vought, Jr., so as to enable him to take a remainder interest in the trust being construed, to the same extent as the three other children of Chance M. Vought, Jr. His guardian ad litem sought a summary determination that the infant Craig is included in that class whereas the guardian ad litem for two of the other children of Chance M. Vought, Jr., sought a determination to the contrary.

Special Term ordered that "the question of whether Craig Vought is the lawful issue of Chance M. Vought, Jr., within the settlor's meaning and intent be * * * referred to [a referee] * * * to hear and report".

It is the opinion of this court that Special Term should have granted the motion of Edward Cherney, guardian ad litem for Craig Vought, and found that Craig Vought is the "lawful issue" of Chance M. Vought, Jr., and is entitled to share in the trust created by Ena Lewis Prochet on June 3, 1931.

On June 3, 1931 the settlor established an irrevocable trust for the benefit of her two unmarried children — Chance M. Vought, Jr., and Peter Vought and their "lawful issue." The relevant portions of the trust are contained in subdivision (a) of article First and article Tenth. They provide as follows:

"(a) To divide the principal of said trust funds into two equal parts or shares and to designate, *hold and invest one of such equal parts or shares for each of my children, Chance M. Vought, Jr.,* and Peter Vought, and to collect and receive, and to pay the income to, or apply the same towards the care, use, education, maintenance and support of the child for whom such equal part or share is designated, *during his life and upon the death* of the child for whom such share was designated, to thereupon pay, assign, transfer, *deliver or convey the principal of the part or share so held in trust for him, to his lawful issue,* in equal shares, per stirpes and not per capita, absolutely, free and discharged of the trust, and failing such issue, then to the other of my said children who shall survive, but if he also should be dead, then to his lawful issue, in equal shares, per stirpes and not per capita, absolutely, free and discharged of the trust. [a][Emphasis ours.]

"TENTH: This Trust shall take effect upon the acceptance by the Trustees and in all respects shall be governed by the laws of the State of New York, and the Trustees by joining in the execution and delivery of this Agreement signify their acceptance of this Trust."

Peter Vought is still living and we are not concerned with that portion of the trust funds set aside for his benefit. The life

interest of Chance M. Vought came to an end on April 2, 1964 when he died, predeceasing his mother who died on October 14, 1965. We are concerned with the distribution of the remainder of the trust funds originally set aside for him.

Chance M. Vought was, married to Edith Haig in 1948. The marriage produced one child, Chance M. Vought, III. That marriage was terminated by a valid divorce. Thereafter, Chance Vought, Jr., married one Eugenie A. Vought in December 1951. Two children, Gay Vought and John Peter Vought were born of this marriage. It is conceded that this marriage was never terminated or dissolved during the lifetime of Chance M. Vought, Jr. While still married to Eugenie, Chance M. Vought, Jr., on March 7, 1960 went through a marriage ceremony with one Sara Wilson, in Alexandria, Virginia. The afore-mentioned Craig Vought was born of that "marriage" on April 13, 1960 in Haverford, Pennsylvania.

It appears from the affidavit of the said Sara Wilson, that she met Chance Vought in the Winter of 1959. She was told by him that he was divorced. Sara Wilson became pregnant by Chance Vought about July, 1959. Apparently, she discovered that Chance Vought was not divorced. However, in March, 1960, and before Craig was born, he told her that he was going to Juarez, Mexico, to obtain a divorce. Upon his return from Mexico he assured her that the divorce had been obtained. It is asserted by Sara Wilson that in her good faith belief that Chance Vought was divorced she married him in Alexandria, Virginia, on March 7, 1960, several days after Chance returned from Mexico. The facts of the marriage and the birth of Craig are supported by detailed documentary evidence, i.e., the certificate of marriage, birth certificate and the birth registration. All of these documents are matters of public record and their authenticity cannot be disputed.

The guardian ad litem for Craig Vought, relying alternatively on New York and Pennsylvania statutes, which he asserts make Craig Vought a legitimate child of Chance Vought, maintains that Craig must be deemed to come within the class of "lawful issue" within the contemplation of the trust. However, those claiming adversely to Craig assert that even if any of the statutes relied on do make Craig legitimate as to Chance, nevertheless his legal status does not bring him within the class of "lawful issue" as intended by the settlor.

Special Term in ordering a hearing stated: "It is the court's opinion that from the reading and examination of the trust agreement it is impossible to decide Craig's status as a matter of law, and that the determination of the settlor's intent in

using the phrase ' lawful issue ' as applied to Craig Vought is a mixed question of law and fact.''

We feel that this question, in the circumstances of this case is one solely of law and, further, that that issue should be determined favorably to Craig.

It might be well to first determine what is meant by the words '' lawful issue '' and with special reference to the time of the execution of this trust, i.e., June 3, 1931. Some cases have indicated that such phrase means nothing more than the term, descendant. (*New York Life Ins. & Trust Co.* v. *Viele,* 161 N. Y. 11, 19; *Matter of Disney,* 118 App. Div. 378, 380.) We do not here accept that definition of that phrase, for were we to do so the word '' lawful '' — especially in the context of this case — would unwarrantedly be deleted.

It is the contention of those claiming adversely to Craig, that '' lawful issue '' — at least in 1931 meant issue born during lawful wedlock. Of course, if we were to adopt that definition, Craig would not come within the class. In support of their contention they cite several cases. It would serve no useful purpose to consider each and every case cited since for the most part they are factually distinguishable from the case at bar.

For example, in *Central Trust Co.* v. *Skillin* (154 App. Div. 227) which is heavily relied upon by those claiming adversely to Craig, the will was made at a time when this State had no statutes in effect which could have made a child legitimate although at birth it was born illegitimate. As will hereinafter be seen, in 1931 when this trust was created there were several such statutes in effect. In *United States Trust Co.* v. *Maxwell* (26 Misc. 276), relied on by those claiming adversely to Craig, there is a clear indication that the testator intended to disinherit the issue of the meretricious relationship.

At any rate, the decision of the Court of Appeals in *Olmsted* v. *Olmsted* (190 N. Y. 458) clearly equated legitimacy with '' lawful issue.'' In that case the court considered the question of whether certain children born of an invalid marriage could be considered '' lawful issue '' within the terms of the will. The court in determining this question considered whether the children were in fact legitimatized by virtue of statutes which made a child born illegitimate, legitimate if the parents thereafter intermarried. The Court of Appeals found that the subsequent marriage in that case was invalid and, therefore, the children were not legitimate. What is significant, however, is that the court equated legitimate — or rather legitimatized, with '' lawful issue.'' It obviously did not consider it necessary in order for

a child to be considered in the class of "lawful issue" to have been born of a valid marriage. That was the import of that decision. If not the entire decision of the Court of Appeals was unnecessary.

The definition offered in the *Olmsted* case was followed in *Matter of Sheffer* (139 Misc. 519) where the court, after fully discussing the meaning of the phrase "lawful issue," defined it as meaning "legitimate descendant."

In the light of the above let us now consider whether Craig Vought should be considered as coming within the class of "lawful issue" as contemplated by the deed of trust under consideration. Of course, the intention of the settlor is the determining factor. However, it must be considered that when the settlor used the phrase "lawful issue" she did so with an awareness of the law as it existed in 1931.

The settlor, in 1931, provided that the trust was to be governed by the law of the State of New York. Carrying out that intention—in determining what she meant by "lawful issue"—we construe the trust as of 1931 and we apply the laws of the State of New York which was the only State which had contact with this trust when it was created. The guardian ad litem for Craig asserts his legitimacy maintaining that since New York recognizes that on the issue of legitimacy, the law of the place of birth controls, and since Craig was born in Pennsylvania, therefore, Pennsylvania law should govern. At the time of Craig's birth, Pennsylvania had the following statute in effect: "In all cases where a supposed or alleged marriage is contracted, which is absolutely void by reason of one of the parties thereto having a spouse living at the time of the supposed or alleged marriage, all children born to such parties shall be deemed the legitimate children of both parties for all purposes." (Pa. Stats. Ann., tit. 48, § 169.1).

There is a great deal of merit to that position despite the fact that the quoted Pennsylvania statute was passed subsequent to the date of the creation of the trust. At that time the existing New York law—which we look to in order to determine the settlor's intention—provided, as indicated, that the place of birth controls on the issue of legitimacy. (*Olmsted* v. *Olmsted, supra.*) That, of course, can refer only to the time when the child was born—whenever that might be.

However, we need not depend on that position, for in 1931 the statutory law in New York provided that children born illegitimate might thereafter be legitimatized. Consequently, in the light of the *Olmsted* decision (*supra*) when so legitimatized they would be considered as "lawful issue."

At the time this trust was established, i.e., in 1931, there were two statutes in effect which had reference to legitimatizing children born illegitimate. One was section 24 of the Domestic Relations Law which legitimatized children born out of wedlock, if their parents thereafter intermarried. The other was section 1135 of the Civil Practice Act, under which, in annulment actions, children of void or voidable marriages might be considered legitimate. We are not really concerned with section 24 of the Domestic Relations Law except that we must consider that statute along with section 1135 of the Civil Practice Act in understanding the use of the words "lawful issue" in 1931. In so doing we can see a legislative intent toward protecting children born illegitimate, and providing ways to make them legitimate, thereby giving them rights similar to children born legitimate. (Such intent is clearly indicated by subdivision 3 of section 145 of the Domestic Relations Law, passed in 1962, which is the statute now in effect corresponding to section 1135 of the former Civil Practice Act, and by which amendment it became mandatory that in the circumstances there set forth, a child must be considered as a legitimate child of both parents.)

We digress to observe that the settlor is presumed to have known this, and that under New York policy, a legitimatized child — to use the language of the Court of Appeals in the *Matter of Park* (15 N Y 2d 413, 417) with respect to adopted children — " has exactly the same ' legal relation ' to the parents as a natural child. In the absence of an explicit purpose stated in the * * * trust instrument to exclude such a child, he must be deemed included, whether the word ' heir ', ' child ', ' issue ' or other generic term expressing the parent-child relationship is used."

As previously mentioned, in 1931 section 1135 of the Civil Practice Act was in force. Subdivision 6 of that statute provided as follows: " 6. If a marriage be declared a nullity or annulled upon the ground that the former husband or wife of one of the parties was living, the former marriage being in force, if it appears, and the judgment determines, that the subsequent marriage was contracted by at least one of the parties thereto in good faith, and with the full belief that the former husband or wife was dead or that the former marriage had been annulled or dissolved, or without any knowledge on the part of the innocent party of such former marriage, a child of such subsequent marriage is deemed the legitimate child of the parent who at the time of the marriage was competent to contract. If either or both parties to such subsequent marriage were incompetent to contract, the court by the

judgment may decide that a child of the marriage is the legitimate child of such an incompetent.''

The facts alleged in the affidavit of Sara Wilson, if accepted, bring this case squarely within the scope of the above section, if she entered into marriage '' in good faith, and with the full belief that the former * * * marriage had been * * * dissolved.''

The guardians for the claimants, adverse to Craig, assert that this section of the Civil Practice Act, in force in 1931 (and now substituted with greater effect by subdivision 3 of section 145 of the Domestic Relations Law) is of no benefit to him inasmuch as it could only be applied in connection with an action for an annulment. However, the courts have decided otherwise in *Matter of Newins* (16 A D 2d 436, affd. 12 N Y 2d 824). In that case, the testator's third marriage was invalid. There had been no suit brought to annul the marriage. The question considered by the Appellate Division was whether the child of the invalid marriage and the wife had standing in the probate proceeding. The Appellate Division struck the wife's appearance but held that the child would have standing by virtue of subdivision 7 of section 1135 of the Civil Practice Act, which provided that where the marriage is annulled for causes other than specifically provided, the court by the judgment '' *may decide that a child of the marriage is the legitimate child of either or both of its parents.*'' The court held that that section could be applied despite the fact that an annulment action had never been brought. And this holding was made perforce when the father was no longer living. It should be noted that in that case the provision authorizing the court to declare the child legitimate was not mandatory, but rather was discretionary, as here. The Court of Appeals affirmed that decision stating '' by reason of the strong legislative policy reflected in subdivision 7 of section 1135 of the Civil Practice Act, we read the broad language of section 40 of the Surrogate's Court Act to vest in the Surrogate the power to decide and declare that a child of a void or voidable marriage is the legitimate child of the descendant whose will or estate is before him.'' (*Matter of Newins,* 12 N Y 2d 824, 826.) And it is quite apparent that legitimacy should be related back to the time of birth because at no time since birth was there any proceeding taken to legitimatize the child involved.

While it is claimed that the statute was interpreted differently in 1931, there is no support for that conclusion. The case of *Matter of Crook* (140 Misc. 721) which reached a contrary result

to that subsequently reached in *Matter of Newins* was decided one month after the trust herein was created. Thus it cannot be said that the settlor relied, or could be deemed to have relied on that court's interpretation. In any event, that court's decision is not controlling. Moreover, the Court of Appeals in *Hiser* v. *Davis* (234 N. Y. 300, 308) in discussing the question in the year 1922 merely stated that it is questionable whether the statute can be used in another action or proceeding, but did not decide that it could not be so used. In *Matter of Newins* (*supra*, p. 442) the court, however, noted that until then "there never has been an authoritative determination" of that issue. The affirmance of the Appellate Division's decision by the Court of Appeals set that question to rest and it must be considered to be a declaration of the law as it always existed.

We thus come to the conclusion that the Supreme Court could, and should have declared Craig Vought to be the legitimate child of Chance M. Vought, Jr., inasmuch as his mother entered into her marriage with Chance M. Vought, Jr., in good faith. And the finding of legitimacy must relate back to the time he was born, for it is merely a reflection of the facts as they existed at that time. To hold otherwise would be holding contrary to the enlightened and progressive policy of the State — the Legislature and the courts alike. (See Domestic Relations Law, § 145, subd. 3.)

In consequence of the above, since even in 1931 the phrase "lawful issue" meant nothing more than legitimate descendants, Craig Vought must be considered as within the class eligible (as were the other children of Chance M. Vought, Jr.) to take a remainder interest in the trust, coming as he does within the scope of subdivision 6 of section 1135 of the Civil Practice Act.

We must add that we see no need for a hearing on the question of the good faith of Sara Wilson at the time she went through the ceremonial marriage with Chance M. Vought, Jr. The marriage and parentage of Craig are established through public records and their authenticity cannot be disputed. Moreover, the parentage had been established in a support proceeding, terminating in an agreement by Chance M. Vought, Jr. and the settlor Ena Lewis Prochet to support Craig. Nor do the affidavits in opposition to the application made on behalf of Craig raise any triable issue as to Sara Wilson's good faith at the time she married Chance M. Vought, Jr.

Accordingly, the order entered January 16, 1967 should be modified on the law to grant the motion of Edward Cherney,

guardian ad litem for Craig Vought, for a summary determination that Craig Vought is one of the lawful issue of Chance M. Vought, Jr., and is entitled to share in the trust created June 3, 1931, with costs to all, parties who have filed briefs. Settle order.

EAGER, J. (dissenting). We should be concerned here with the matter of the proper construction of the trust indenture, executed and delivered in 1931, rather than with the rendering of a judicial declaration that Craig Vought is a legitimate child of the settlor's son. Craig's right to succeed to a remainder interest in the trust fund depends upon the terms of the instrument and those terms may not be broadened by court decree. A judicial determination conferring upon him the status of legitimacy, if authorized by statute and proper in this proceeding, may not serve to modify the settlor's donative intent when she directed the transfer of the remainder of the trust estate to the " lawful issue " of her son. (See *Central Trust Co.* v. *Skillin,* 154 App. Div. 227, 229; see, also, *Matter of Fosdick,* 4 N Y 2d 646, 655.)

Since this is a matter to be decided on the basis of the proper construction of the provisions of the trust indenture, the cardinal rule to be followed is to seek and give effect to the settlor's intention as disclosed by the wording of the indenture. (*Matter of Cowles,* 22 A D 2d 365, 373, affd. 17 N Y 2d 567; *Matter of Day,* 10 A D 2d 220, 222.) " We are to search, not for the probable intention of the settlor merely, but for the intention which the trust deed itself, either expressly or by implication, declares. We are to ascertain the intention from the words used and give effect to the legal consequences of that intention when ascertained. (*Matter of Silsby,* 229 N. Y. 396, 402.) " (*Central Union Trust Co.* v. *Trimble,* 255 N. Y. 88, 93.) The words and terms of the indenture that have an ordinary or commonly accepted meaning should be given that meaning unless the context of the instrument as a whole or relevant attending circumstances clearly indicate a different sense. (10 N. Y. Jur., Contracts, § 195; 17 Am. Jur., 2d, Contracts, § 249; 17A C. J. S., Contracts, § 301; *Matter of Underhill,* 176 Misc. 737, 739.)

The intention of the settlor is to be ascertained in light of the statute and general law as the same existed in 1931 when the indenture was executed and delivered. (*Dolman* v. *United States Trust Co.,* 2 N Y 2d 110, 116; *Matter of Fosdick, supra,* p. 655; 17A C. J. S., Contracts, § 330; 17 Am. Jur. 2d, Contracts, § 257; 10 N. Y. Jur., Contracts, § 204.) Thus it follows that the settlor used the words " lawful issue " in view of the mean-

ing and effect ascribed to them by the then prevailing statutory enactments and decisional law. (*Central Trust Co.* v. *Skillin, supra,* p. 232; *Matter of Underhill, supra,* p. 739; *Matter of Sheffer,* 139 Misc. 519, 522; *Matter of McKinney,* 5 Misc 2d 210, 213; *Matter of Kellogg,* 36 Misc 2d 1064.)

The majority agrees that the settlor "must be considered" to have "used the phrase 'lawful issue' * * * with an awareness of the law as it existed in 1931." But, in this connection, it should also be conceded that the words "lawful issue" had an accepted and settled meaning in 1931. They were understood to embrace children born in lawful wedlock. They were so used in the statutes relating to the descent and distribution of property (see Decedent Estate Law, § 83, subd. 13). The uniform holding of the decisions throughout the United States was that such words should have such meaning. For instance, in *Central Trust Co.* v. *Skillin (supra,* p. 230), the court, citing many decisions, said: " In popular usage the words 'lawful issue' have an accepted meaning. All children are 'issue' of their parents, for the operation of natural laws favorable to the procreation and birth of offspring is not affected by the existence or non-existence of a marital contract. But when this word relating to children is qualified by the adjective 'lawful', it is ordinarily understood to mean those begotten and born in lawful wedlock and none others. [Citing cases.] * * * At common law the words 'child,' 'son,' 'issue,' even when unqualified by the adjective 'lawful,' excluded all but the latter class. [Citing cases.] " (See, also, *Matter of Underhill, supra,* p. 739, also referring to several decisions.) Consequently, in construing wills and trust indentures, it was generally held that a child born out of lawful wedlock would not take a remainder directed to be set over to the lawful issue of the life beneficiary. This was the general rule in 1931 at the time of the execution and delivery of the trust indenture. (See *Olmsted* v. *Olmsted,* 190 N. Y. 458, affd. 216 U. S. 386; *Central Trust Co.* v. *Skillin, supra; Matter of Underhill, supra; United States Trust Co.* v. *Maxwell,* 26 Misc. 276; *Braun* v. *Gilsdorff,* 126 Misc. 366. See, also, 7 Am. Jur., Bastards, § 140; *Flora* v. *Anderson,* 75 F. 217; *Marsh* v. *Field,* 297 Ill. 251; *Brisbin* v. *Huntington,* 128 Iowa 166; *Lyon* v. *Lyon,* 88 Me. 395; *Matter of Cline,* 128 Pa. Super. Ct. 309.)

*Olmsted* v. *Olmsted (supra)* stands for the holding that children born of a bigamous marriage are not considered "lawful issue" and this decision does not, as contended by the majority, lend support to its conclusions. In *Olmsted,* the testator's son was married in New York, and had four children

by that marriage. Eventually he abandoned his New York family, went to New Jersey and purported to marry another woman by whom he had two children. As stated by the Court of Appeals (p. 466): " [t]hese children were concededly illegitimate." After the birth of the children in New Jersey, the testator's son moved to Michigan where, without due process as to his lawful wife, he divorced her and again "married" his second wife. The court held that the later marriage was polygamous; that the two children born in New Jersey were not "lawful issue" for the purpose of the distribution of a trust remainder under the testator's will; that the children were not aided by a Michigan statute legitimatizing children born out of wedlock where their parents later marry; and that the statute did not apply to polygamous marriages. Reaching the conclusion that the rights of the children of the first marriage had become vested and could not be diluted by a subsequently enacted statute, the court significantly added (p. 467): "Should we sanction the doctrine contended for, then * * * the statute of Michigan, passed in 1881, could change the provisions of a will executed here and probated in 1874, bringing in persons as remaindermen who, under the provisions of the will, were not remaindermen, nor entitled to share in the estate. We think this should not be permitted."

There is nothing in the particular trust indenture before this court to indicate that the settlor used the words "lawful issue" other than in accordance with its settled meaning as applied in *Olmsted* and in numerous other decisions, including those cited, *supra.* There is no reason to assume that the settlor intended to provide for a child born to her son as a result of an illicit relationship. She would not anticipate that her son might thereafter deliberately enter into a bigamous marriage in furtherance of such relationship. Even if she considered such a possibility, she would have had in mind the prevailing law that a child born to the woman of such marriage would be considered an illegitimate child of the settlor's son and not embraced by the term "lawful issue".

Furthermore, it should be noted that the trust remainder was set over on the son's death to his lawful issue "in equal shares, per stirpes and not per capita". In providing for a "per stirpes" disposition of the remainder to issue, it may be assumed that the settlor had in mind the then existing statutory rules which would govern the descent and distribution of the son's property on his death. (See Decedent Estate Law, § 83; *Braun* v. *Gilsdorff, supra.*) The settlor may be deemed to have directed distribution per stirpes to lawful

issue with the understanding that the remainder would be distributed to the son's descendants who would have the right of inheritance as his issue. Viewed in this light, the adherence to the settlor's intent precludes a taking by a child born of the improper relationship; such a child would not take as issue under the statutes of descent and distribution. (See Decedent Estate Law, § 83.)

Certainly, we may not assume that the settlor's "awareness of the law" included the knowledge of the existence and an understanding of the effect of the statute (former Civ. Prac. Act, § 1135) which authorized the court by a judgment in a proper action or proceeding to determine that the child of a possible bigamous marriage of her son should be deemed a legitimate child of such son. Moreover, if she or the draftsman of her indenture were aware of such statute, she would have concluded that the legitimatizing of the issue of a son born of a bigamous marriage could only be accomplished by a judgment in an action for annulment. This was the then prevailing view of the decisions. (*Hiser* v. *Davis,* 234 N. Y. 300, 307; *Matter of Wright,* 137 Misc. 391; *Matter of Crook,* 140 Misc. 721; *Anonymous* v. *Anonymous,* 174 Misc. 906.) She had no reason to anticipate the decision rendered 30 years later in *Matter of Newins* (16 A D 2d 436, affd. 12 N Y 2d 824), and it is not proper to construe her indenture in light of such decision. In any event, the settlor would have the right to assume that no court would have the power to alter the trust indenture or broaden the term "lawful issue" to include children born to her son other than in lawful wedlock.

Finally, we note that the majority assumes that the mother of Craig entered into her marriage with the settlor's son in good faith. Such a conclusion, we submit, is improper without affording the interested parties an opportunity of a hearing on the relevant issues in this connection. But, as indicated aforesaid, we think that the question of good faith is immaterial.

On the basis of unquestioned rules of construction and in accordance with the prevailing decisional law, the order of January 16, 1967 should be modified on the law to declare that Craig Vought is not entitled to share under the trust indenture of June 3, 1931.

BOTEIN, P. J., and TILZER, J., concur with RABIN, J.; EAGER, J., dissents in opinion in which McNALLY, J. concurs.

Order entered on January 16, 1967, modified, on the law, so as to grant the motion of Edward Cherney, guardian ad litem

for Craig Vought, for a summary determination that Craig Vought is one of the lawful issue of Chance M. Vought, Jr., and is entitled to share in the trust created June 3, 1931, with $50 costs to all parties filing briefs payable out of the fund. Settle order on notice.